UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Tasia Williams and Vincent Doyle, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | CIVIL CAUSE NO. 3:20-cv-01526-G |
| | § | |
| | § | |
| City of Dallas, Texas; Chief Ulysha Reneé | § | |
| Hall; John Doe Police Officers 1–50, | § | |
| | § | |
| | § | |
| Defendants | § | |

---

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER**

---

**Michelle Simpson Tuegel**
TX Bar No. 24075187
*Admitted*
**THE SIMPSON TUEGEL
LAW FIRM**
3301 Elm St.
Dallas, Texas 75226

**Daryl K. Washington**
TX Bar No. 24013714
*Admitted*
**WASHINGTON LAW
FIRM, PC**
325 N. St. Paul St.,
Suite 3950
Dallas, Texas 75201

**Daniel A. Dailey, Esq.**
IL Bar No. 6312616
*Admitted*
**Tatiauna J. Holland, Esq.**
TX Bar No. 24090519
**Adam Greenfield**
TX Bar No. 24075494
*Admitted*
**KINGDOM LITIGATORS,
INC.,** *A Public Interest
Law Firm*
100 Crescent Court
Ste. 700
Dallas, Texas 75201

**Morgan A. McPheeters**
TX Bar No. 24081279
*Admitted*
**MCPHEETERS LAW, PLLC**
4447 N. Central Expy.,
Suite 101 #158
Dallas, Texas 75205

**Jessica Foster**
TX Bar No. 24094123
*Admitted*
1408 N. Riverfront Blvd.,
Suite 241
Dallas, Texas 75207

**George Oginni**
TX Bar No. 24108191
**LEO & OGINNI TRIAL
LAWYERS, PLLC**
3801 Kirby, Suite 605
Houston, Texas 77098

**ATTORNEYS FOR PLAINTIFFS**

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................3

I.    FACTUAL BACKGROUND .............................................................................. 4

    A.    Protesters, bystanders, and press face ongoing risk of harm while protesting against brutality and racial injustice in Dallas ...................................... 4

    B.    Pressure grows to address the widespread police violence seen during the 2020 Protests. ..................................................................10

    C.    The so-called "less lethal" KIPs and chemical agents are still deadly..................................................................................................13

    D.    President Trump's presence in Dallas on the evening of Thursday, June 11, is likely to spur continued—and potentially greater—protests. ..................................................................................................15

II.   ARGUMENT & AUTHORITIES...........................................................................18

    A.    Standard for Injunctive Relief........................................................................18

    B.    Plaintiffs are likely to succeed on the merits of their claims because DPD's use of allegedly "less lethal" force against non-threatening protesters is unconstitutional. ..................................................................18

        1.    Defendants violated Plaintiffs' First Amendment rights. .........................18

            a.    DPD's policies of using excessive deadly force toward protesters cannot survive scrutiny, the test that governs here. ...............................19

            b.    Even if intermediate scrutiny applied, DPD's policies of using excessive deadly force toward protesters could not survive. ...............................21

        2.    Defendants violated Plaintiffs' Fourth Amendment rights. ...................23

    C.    Plaintiffs will suffer irreparable harm. ................................................. 24

    D.    A preliminary injunction will not cause any harm to the City of Dallas. ..................................................................................................25

    E.    The balance of equities and public interest weigh in favor of an injunction. ..................................................................................................26

III.  CONCLUSION ............................................................................... 28

TABLE OF AUTHORITIES

## Cases

*Abay v. City of Denver*, No. 20-CV-01616-RBJ, 2020 WL 3034161 (D. Colo. June 5, 2020) ........ 27

*Aebisher v. Ryan,* 622 F.2d 651 (2d Cir. 1980) ................................................................. 24

*Allee v. Medrano*, 416 U.S. 802 (1974) .......................................................................... 18

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) ............................................................. 27

*Boos v. Barry,* 485 U.S. 312 (1988) .............................................................................. 19

*Brown v. DFW Gateway Oaks Apartments LLC*, No. 3:19-CV-1928-B-BH, 2020 WL 1942139
    (N.D. Tex. Apr. 6, 2020), *report and recommendation adopted*, No. 3:19-CV-1928-B-BH, 2020
    WL 1940568 (N.D. Tex. Apr. 22, 2020) ................................................................. 26

*Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175 (1968) ............................... 22

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981).......... 28

*Cole v. Carson*, 935 F.3d 444 (5th Cir. Aug. 20, 2019) .................................................... 23

*Cole v. Hunter*, 68 F. Supp. 3d 628 (N.D. Tex. 2014) ..................................................... 23

*Daves v. Dallas Cty., Texas*, 341 F. Supp. 3d 688 (N.D. Tex. 2018) .................................. 27

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009) (per curiam) ....................................... 23

*Edwards v. South Carolina*, 372 U.S. 229 (1963) ........................................................... 19

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................ 24

*Gbalazeh v. City of Dallas, Tex.,* No. 3:18-CV-0076-N, 2019 WL 2616668 (N.D. Tex. June 25,
    2019) ............................................................................................................. 28

*Gbalazeh v. City of Dallas, Texas*, No. 3:18-CV-0076-N, 2019 WL 2616668 (N.D. Tex. June 25,
    2019) ............................................................................................................. 27

*Graham v. Connor*, 490 U.S. 386 (1989)........................................................................ 23

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496 (1939) .................................................... 21

*Henry v. First Nat. Bank of Clarksdale*, 595 F.2d 291 (5th Cir. 1979) ............................... 19

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ............................. 27

*Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992 (5th Cir. 1985)........................... 24

*Horton v. City of Houston,* 179 F.3d 188 (5th Cir. 1999).................................................. 22

*Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274 (5th Cir. 1996) .......... 27

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ........................................................ 18, 24

*Jones v. Parmley,* 465 F.3d 46 (2d Cir. 2006) ............................................................... 19

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)........................................... 19, 20

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)........................................... 20

*NAACP v. Button*, 371 U.S. 415 (1963) ...................................................................... 24

*Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303 (5th Cir. 2008) ...................... 24

*Roho, Inc. v. Marquis*, 902 F.2d 356 (5th Cir. 1990) ...................................................... 18

*Tennessee v. Garner*, 471 U.S. 1 (1985) ...................................................................... 23

*Texas Democratic Party v. Abbott,* No. CV SA-20-CA-438-FB, 2020 WL 2541971 (W.D. Tex. May
    19, 2020) ...................................................................................................... 27

*United States v. Grace*, 461 U.S. 171 (1983) ............................................................... 21

*United States v. O'Brien,* 391 U.S. 367 (1968) ............................................................. 21

*World Wide St. Preachers Fellowship v. Town of Columbia,*
245 F. App'x 336 (5th Cir. 2007) ................................................................ 19, 21, 24

**Rules**

Fed. R. Civ. P. 65(a) ................................................................................................ 4

Fed. R. Civ. P. 65(c) ................................................................................................ 28

### PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs Tasia William and Vincent Doyle file this Brief in Support of their Motion for Temporary Restraining Order and urge this Court to issue temporary injunctive relief pursuant to Federal Rule of Civil Procedure 65 enjoining the use of "less lethal" weapons such as tear gas, smoke bombs, flash-bangs, pepperballs, and mace, as well as what are known as "kinetic impact projectiles" (or "KIPs"), such as rubber, sponge, and foam bullets, against persons who are not posing any immediate threat of serious harm to anyone and/or for crowd control. *See* Fed. R. Civ. P. 65(a).

Plaintiffs hereby incorporate by reference as if set forth herein: (1) Plaintiffs' Original Complaint filed in this Court on June 11, 2020, (2) Plaintiffs' Motion for Temporary Restraining Order, and (3) Plaintiffs' Appendix in Support of Motion for Temporary Restraining Order, and would respectfully show the Court the following:

## I.    FACTUAL BACKGROUND

**A.    Protests face ongoing risk of harm at protests against police brutality in Dallas.**

Over the past two weeks of protests in Dallas relating to police brutality and racial injustice, City of Dallas Police Chief Hall has defended her decisions to authorize the Dallas Police Department ("DPD") to assert their dominance over protesters and the citizens of Dallas

seeking to exercise their First Amendment rights by shooting protesters with so-called "less lethal" weapons. In fact, these allegedly "less lethal" are anything but. Hundreds of reports of peaceful protesters, journalists covering protests, and bystanders bleeding and suffering from unwarranted levels of police force threaten to chill constitutionally protected participation in ongoing demonstrations in Dallas. And not even the pandemic respiratory virus Covid-19 has deterred police from tear gassing and smoke bombing protesters, making it very possible that many people exercising their First Amendment rights could suffer more severe Covid-19 symptoms aggravated by tear gas and smoke bombs.[1]

Plaintiffs' Vincent Doyle and Tasia Williams represent just two of the many protesters, bystanders, and press who have been senselessly injured by Dallas Police over the past two weeks of peaceful demonstrations. Plaintiff Vincent Doyle, an aspiring photojournalist, went to downtown Dallas to film protests on May 30.[2] When he arrived and headed to the area near Bank of America, Mr. Doyle said the event was entirely peaceful, with approximately 100 to 200 on their knees chanting.[3] Suddenly, and without any apparent provocation, Mr. Doyle says, officers told the crowd to disperse as they began indiscriminately firing tear gas at the crowd.[4] Mr. Doyle stepped behind police to load more film into his camera, where he had a chance to observe officers' response to what was happening.[5] Rather than express concern for citizens' safety, officers were eating pizza and laughing together.[6]

---

[1] App'x. Tab 3, Lisa Song, *Tear Gas Is Way More Dangerous Than Police Let On — Especially During the Coronavirus Pandemic*, PROPUBLICA.ORG (June 4, 2020, 12:25 p.m.), https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic.
[2] App'x. Tab 2 ¶¶ 2–3.
[3] *Id.* ¶¶ 4–5.
[4] *Id.* ¶ 8.
[5] *Id.* ¶ 8.
[6] *Id.*

Later, in compliance with police instructions to clear the streets, Mr. Doyle moved to a public parking lot.[7] There, officers shot Mr. Doyle in the face with a sponge/rubber bullet KIP.[8] As Mr. Doyle heard more projectiles and tear gas being fired, blood poured from his face as Mr. Doyle screamed, trying to warn protesters that more tear gas could be coming and began recording video with his phone.[9] Other protesters came to his side to rush him to the hospital in their car but faced a roadblock, where police said they must await an ambulance indefinitely.[10] At that point, Mr. Doyle felt tired and like he might pass out because he had lost so much blood.[11] Instead police demanded Mr. Doyle's identification and tried to convince Mr. to incorrectly admit that he actually was hit with a *brick* by one of the *other protesters* instead of a sponge/rubber bullet shot by police—which was completely inconsistent with what Mr. Doyle saw, heard, and experienced.[12] The incident left him in disbelief at the police brutality and injustice.[13] Still, if Mr. Doyle is physically able, he says he would return to the 2020 Protests in Dallas if he knew that Dallas Police were prohibited from using the KIPs and other riot control devices and techniques against non-threatening protestors or in a manner that threatens his constitutional rights.[14]

Then on Monday, June 1, Dallas Police detained approximately 674 protesters on the Margaret Hunt Hill Bridge (the "Bridge") at the end of a march that was, by all accounts, entirely peaceful. Video footage taken by march participants confirms: The only violence on the Bridge came from Dallas Police officers who fired these "less lethal" bullets at demonstrators,

---

[7] *Id.* ¶ 11.
[8] *Id.*
[9] *Id.*
[10] *Id.* ¶ 12.
[11] *Id.*
[12] *Id.* ¶ 13.
[13] *Id.* ¶ 19.
[14] *Id.*

along with smoke bombs and, reportedly, tear gas.[15] Assessing the incident the next day, Chief Hall said, "I strongly believe we made the right decisions to deter and disperse the large crowd on the bridge."[16]

But the Dallas Police did *not* "deter" or "disperse" the crowd and instead *prevented* protest participants from leaving by blockading them onto the Bridge, a technique called "kettling."[17] When the crowd's march from downtown reached the intersection with the roadway leading to the Bridge, demonstrators found the westbound ramp onto the Bridge was not blocked by police, unlike other sides of the intersection.[18] Protesters and journalists on the scene say they were told by officers to "continue moving" but were never warned not to walk up the ramp.[19] Once the last of the marchers were on the Bridge, police in riot gear and armored vehicles enclosed protesters on both ends, trapping them onto the Bridge over thirty feet above the ground.[20]

Video from the leading edge of the westward march shows that as the group approaches the center of the Bridge, a solid line of police clad in riot gear meet them at the Bridge's apex, stopping the march in its tracks.[21] Protesters can all be seen frozen with hands raised, chanting

---

[15] App'x. Tab 4, Matt Goodman, *The Worst City Council Meeting Dallas Has Witnessed in a Decade*, DMAGAZINE.COM (June 6, 2020 12:33 p.m.), https://www.dmagazine.com/frontburner/2020/06/the-worst-city-council-meeting-dallas-haswitnessed-in-a-decade.
[16] *Id.*
[17] App'x. Tab 5, Silas Allen, *Kettling Tactic Dallas Police Used Against Protesters is Steeped in Controversy*, DALLASOBSERVER.COM (Jun 8, 2020, 4:00 a.m.), https://www.dallasobserver.com/news/dallas-police-protesters-kettling-margaret-hunt-hillbridge-11916828.
[18] App'x. Tab 6, Tim Cato, *I was Detained in Dallas' Bridge Raid. It Never Needed to Happen*, DMAGAZINE.COM (June 3, 2020, 3:44 pm), https://www.dmagazine.com/frontburner/2020/06/i-was-detained-in-dallas-bridge-raid-it-never-needed-to-happen/.
[19] *Id.*
[20] *Id.*
[21] App'x. Tab 7, @thatgirljacqs, TWITTER (June 2, 2020), https://twitter.com/thatgirljacqs/status/1268002580602421248, :09.

"Hands up! Don't shoot!" As the line of police continues to advance eastward toward them, the group kneels.[22] But police continue marching toward the kneeling protesters. Over a minute passes as police close the gap, coming less than 20 to 30 feet from the group, even as protesters periodically stand to back up before kneeling again.[23] Suddenly and without warning or any provocation, police launch canisters directly at protesters, catching fire before releasing smoke or tear gas.[24] At about the same time, tactile weapons can be heard firing, as the peaceful crowd screams.[25] As the crowd continues to back away from the smoke and police, the police line keeps marching toward them, shooting projectiles at the retreating protesters.[26] As protesters peacefully attempt to retreat, they are heard pleading: "This is a peaceful protest! We're peaceful!" ". . . Peaceful!!"[27]

Having "seen nonviolent protesters in virtually every state get gassed, shot at, beaten, and arrested over the weekend," the members assumed they would be safe if they did not resist the police: "Instead, we knelt. We put our hands up. I think we started chanting, 'Don't shoot.' Local reporters attest we had not committed a single act of violence or destruction the entire night. Moments later, they opened fire on us."[28] Despite Chief Hall's claim later that police warned protestors that marching onto the Bridge would lead to arrest, protesters say they never heard that warning.[29] Additionally, the DPD's march towards the peaceful protesters on the

---

[22] *Id.,* at :15.
[23] *Id.*
[24] *Id.* at 1:18.
[25] *Id.*
[26] *Id.* at 1:22–1:57.
[27] *Id.* at 1:58–2:09.
[28] *See* Tab 6.
[29] *Id.*

Bridge that night was protracted, slow, and coordinated—so the DPD's and Chief Hall's actions cannot even be justified by an alleged necessity of a "split second" decision on their part.

Plaintiff Tasia Williams was one of the protesters injured on the Bridge by a so-called "less lethal" rubber or spong bullet.[30] First, police attacked Ms. Williams and the group with smoke or tear gas.[31] Then, as the crowd retreated from police, Ms. Williams was left on the front lines, where officers shot two rubber or sponge bullets directly at her and a friend, striking Ms. Williams in the thigh.[32] As the officers advanced, they ignored Ms. Williams' wounds but proceeded to arrest her regardless, zip-tying her hands behind her back and forcing her to lay on her stomach facedown on the pavement for over 30 minutes while officers zip-tied the hands of the nearly 700 other protesters.[33] At least three hours passed by the time Ms. Williams had received medical attention and was released.[34]

Having experienced firsthand the very police brutality and injustice she showed up to protest, Ms. Williams' experience made her mistrust police, the City, and the government and left her terrified to protest unless she is certain that she will not again be harmed for peacefully protesting.[35] Still, she wants to continue her efforts to peacefully protest and to return to actively protesting in a peaceful exercise of her First Amendment rights.[36]  In fact, despite her suffering, she would return to the 2020 Protests in Dallas if she knew that Dallas Police were prohibited

---

[30] App'x. Tab 1 ¶ 13.
[31] *Id.* ¶ 11.
[32] *Id.* ¶ 11–13; App'x. Tab 8, Video footage of Tasia Williams being shot on Bridge.
[33] *Id.* ¶¶ 14–16.
[34] *Id.*
[35] *Id.* ¶¶ 17–18.
[36] *Id.*

from using the KIPs and other riot control devices and techniques against non-threatening protestors.[37]

These stories are only some of those that continue to emerge from the 2020 Protests in Dallas.[38] The conduct of the Dallas Police, particularly toward peaceful protestors, shows that Dallas Police are present at protests not simply to prevent property damage and keep the public safe but rather to *counter* the police brutality protests. Indeed, Dallas Police have been dressed and armed to use violence at these events. It is evident through its militaristic, indiscriminately violent conduct toward peaceful protesters, bystanders, press—and as widely captured on video—that the Dallas Police were not there to serve a public safety role, but instead to dominate and/or retaliate against the protesters.

## B.    Pressure grows to address the widespread police violence seen during the 2020 Protests.

Following the incidents in which Plaintiffs were injured and in what has been called "the worst city council meeting Dallas has witnessed in a decade," Dallas Mayor Eric Johnson grilled Chief Hall about the incident on the Bridge and challenging her claim that officers did not tear gas protesters that night.[39] "Hall said tear gas was not fired, that it was smoke. She said she ordered the SWAT team to not fire tear gas. Mayor Johnson then wanted to know the chemical breakdown in the smoke. She could not say. Councilman Adam Medrano said he believed the

---

[37] *Id.*

[38] App'x. Tab 9, *See* Dallas Morning News reporter Kevin Krause, @KevinRKrause, TWITTER (May 30, 2020, 8:04 p.m.), https://twitter.com/KevinRKrause/status/1266898396339675137/; *see also* App'x. Tab 10, Amanda Arnold, *"Rubber Bullets" Are Not Rubber*, THECUT.COM (June 5, 2020), https://twitter.com/mcgrudis/status/1268591923402436609/photo/1; *see also* App'x. Tab 11, *Dallas Protester Undergoes Multiple Surgeries After Being Shot With Rubber Bullet*, DALLAS POLICE, NBCDFW.COM (June 4, 2020, 6:42 p.m.), https://www.nbcdfw.com/news/local/dallas-protester-undergoes-multiple-surgeriesafter-being-shot-with-rubber-bullet/2382882/.

[39] Tab 4.

chief's order to not fire tear gas was disobeyed, because the reactions of those on the bridge was so violent. He demanded that she determine who violated her order."[40]

Across America, cities are announcing plans to consider significant changes in police protocol and, with some analyzing whether to drastically limit the extent and funding of police departments as a whole. Indeed, city councils and mayors of major cities like Minneapolis, Los Angeles, and New York City have committed to reducing—or even defunding entirely—their police departments.[41] Likewise, "[a] growing number of people suffering serious injuries in Dallas, Austin and across the nation from plastic, rubber and wooden bullets are raising new questions about how and when police officers use these weapons."[42] And on June 9, Austin's police chief "banned the use of these weapons for crowd control purposes after a 20-year-old black man, a Latino teenager and a pregnant woman were critically injured."[43]

Under this constant pressure, Chief Hall announced on Thursday, June 4, 2020, that she "had instituted a new general order compelling members of the department —both sworn and non-sworn—'to either stop, or attempt to stop, another employee when force is being inappropriately applied or is no longer required.'"[44] Then on Monday, June 8, Chief Hall

---

[40] *Id.*

[41] App'x. Tab 12, Danielle Wallace, *These cities have begun defunding police in the wake of George Floyd protests*, FOXNEWS.COM (June 8, 2020), https://www.foxnews.com/us/defund-police-george-floyd-protest-reforms-new-york-los-angelesminneapolis

[42] App'x. Tab 13, Nic Garcia, *Texas police deployed less-lethal ammunition to control protests. Now policymakers want to ban the weapons*, DALLASNEWS.COM (June 9, 2020 11:13am), https://www.dallasnews.com/news/2020/06/09/texas-police-deployed-less-lethal-ammunition-to-control-protests-now-policymakers-want-to-ban-the-weapons/.

[43] *Id.*

[44] App'x. Tab 14, Hayat Norimine, *Dallas' Chief Hall implements 'duty to intervene' policy after calls for greater police accountability*, DALLASNEWS.COM (June 5, 2020 1:04 a.m.), https://www.dallasnews.com/news/crime/2020/06/05/dallas-chiefhall-implements-duty-to-intervene-policy-after-nationwide-calls-for-police-accountability/.

officially banned chokeholds and "said next week the Dallas Police Department will institute a policy requiring officers to announce warnings before shooting."[45] Chief Hall also has said that next month the Dallas PD will institute a policy requiring police to announce warnings before shooting, "to release more dash cam and body cam videos as well as order a review all use of force policies."[46]

Yet the City and Chief Hall have announced *no* plans to enact policies that address the use of KIPs and other riot control devices as "crowd control"—or to review whether they can be used at all in a safe constitutional manner. And Chief Hall has intentionally failed to identify the officers responsible for causing Plaintiffs' injuries. Since at least September 2018, however, the City of Dallas and Chief Hall have been aware that their policies and training on Pepper Balls, a form of KIP, did not equip officers to safely use other "less lethal" munitions in peaceful protest scenarios. Specifically, it was evident then in 2018 when Dallas Police used Pepper Balls on a non-threatening crowd of the protests following Botham Jean's murder by DPD officer Amber Guyger.[47] Although Chief Hall initially suspected officers fired at people posing no immediate threat to the public, violating DPD General Orders, she took no action against any officers.[48] It appears no new PepperBall policy or training has since been developed. Similarly, although DPD

---

[45] App'x. Tab 15, J.D. Miles, *Dallas Police Chief Renee Hall Lays Out More Policies Addressing Use Of Force, Racial Bias*, CBSLOCAL.COM (June 8, 2020, 3:35 p.m.), https://dfw.cbslocal.com/2020/06/08/dallas-police-chief-renee-hallpolicies-use-force-racial-bias/.

[46] *Id.*

[47] App'x Tab 25, Mo Barnes, *Dallas PD's violent response to peaceful protests in Botham Jean shooting*, ROLLINGOUT.COM (Sept. 12, 2018) https://rollingout.com/2018/09/12/dallas-pds-violent-response-to-peaceful-protests-in-botham-jean-shooting/#respond.

[48] App'x 26, Cassandra Jaramillo, *Dallas officer's pepper-ball use during Botham Jean protest deemed 'consistent' with policy*, DALLASNEWS.COM (Dec 28, 2018 6:00 a.m.), https://www.dallasnews.com/news/2018/12/28/dallas-officerspepper-ball-use-during-botham-jean-protest-deemed-consistent-with-policy/.

has used the "sponge" round KIPs since at least around 2013, it has never developed a policy or training program for them. Against this backdrop, immediate federal intervention is necessary to enjoin the unconstitutional use of excessive force to disperse and suppress peaceful protests.

**C.     The so-called "less lethal" KIPs and tear gas are still deadly.**

"Rubber bullets are bullets. Bullets can kill."[49] KIPs—often called "rubber," "sponge," or "foam" bullets—describe a category of ammunition used commonly in crowd-control settings, and also include PepperBalls. Some KIPs are made of hardened foam or plastic, often containing a rigid or metal core. Others are "beanbag" type rounds, and others may be composed of rubber or wood.[50]

"Regardless of their composition, these projectiles are shot out of guns at speeds comparable to that of a typical bullet, and when they hit their target, they can main, blind, or even kill."[51] Although police departments like Dallas often use KIPs in crowd control because they are "nonlethal" or "less lethal," research shows they cannot be used safely. At close range, they "can break bones. They can facture skulls. If they hit the face, they can cause permanent damage and disability."[52] And even at long distances, they "have unpredicted trajectories, they bounce, and they're quite indiscriminate."[53] In fact, some police departments prohibit KIP usage within 165 feet.[54]

---

[49] App'x. Tab 16, Brian Resnick, *Rubber bullets can seriously mess you up: The dangers of "nonlethal" police weapons—like rubber bullets, flash-bang grenades, and tear gas—explained*, VOX.COM (June 4, 2020, 9:21 a.m.), https://www.vox.com/identities/2020/6/3/21279047/rubber-bullets-flash-bang-tear-gas-police-protests
[50] App'x. Tab 17, Alyssa Fowers, Aaron Steckelberg, & Bonnie Berkowitz , *A guide to the less-lethal weapons that law enforcement uses against protesters*, WASHINGTONPOST.COM (June 5, 2020), https://www.washingtonpost.com/nation/2020/06/05/less-lethal-weapons-protests/?arc404=true.
[51] Tab 10, Amanda Arnold.
[52] *Id.*
[53] *Id.*
[54] *See* App'x. Tab 17.

An independent 2017 study found that these projectiles have caused significant morbidity and mortality during the past 27 years, much of it from penetrative injuries and head, neck and torso trauma.[55] Given their inherent inaccuracy, potential for misuse and associated health consequences of severe injury, disability and death, KIPs do not appear to be appropriate weapons for use in crowd-control settings. There is an urgent need to establish international guidelines on the use of crowd-control weapons to prevent unnecessary injuries and deaths.

The findings of the 2017 BMJ study indicate that KIPs have caused serious injury, disability and death. In the 26 studies selected for analysis, researchers identified 1,984 people with injuries, 53 of whom died as a result of their injuries. Among those injured, fifteen percent of the injuries resulted in permanent disability; 3 percent resulted in death.[56] Injuries were to the eyes overwhelmingly (84.2 percent) resulted in blindness. *Id.* Permanent disabilities and severe injuries often resulted from strikes to the head and neck (48 of deaths and 87% of permanent disabilities). *Id.* These findings indicate that these "less lethal" weapons still readily cause severe injuries and death.

Accordingly, organizations like Physicians for Human Rights have concluded "KIPs in general are not an appropriate weapon for crowd managements and, specifically, for dispersal purposes. Most *cannot* be used effectively and safely against crowds. At close ranges, levels of lethality and patterns of injury of some KIPS become similar to those of live ammunition. At

---

[55] App'x. Tab 18, Haar RJ, Iacopino V, Ranadive N, et al.  *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review.* BMJ OPEN (2017), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/.
[56] *See* Tab 16.

longer ranges, KIPs are inaccurate and indiscriminate. And some KIPs are lethal in close range *and* ineffective at longer distances which make safe use difficult."[57]

That is why law enforcement and experts are warning that "[r]ubber bullets should be used only to control "an extremely dangerous crowd," said Brian Higgins, the former police chief of Bergen County, New Jersey.[58] "Shooting them into open crowds is reckless and dangerous," said Dr. Douglas Lazzaro, a professor and expert in eye trauma at NYU Langone Health.

Accordingly, it is no wonder that lawmakers in Texas and nationwide are calling for a ban on this "less lethal ammunition." Texas State Representative Erin Zwiener said: "We have people in critical condition at the hospital. . . . Even if these aren't as life-ending as often, they're certainly life-altering. And I'm not seeing these weapons used with the judiciousness and respect for life that a weapon of the kind requires."[59]

**D.    President Trump's presence in Dallas on the evening of Thursday, June 11, is likely to spur continued—and potentially greater—protests.**

On Thursday, June 11, 2020, President Trump will be visiting Dallas for a $10 million dollar fundraiser and to purportedly discuss race relations and policing issues. Despite Pres. Trump's presence and proclivity to incite riots, groups from all over Dallas, Texas still plan to

---

[57] App'x. Tab 19, Physicians for Human Rights, Kinetic Impact Projectiles Factsheet (2016) (citing PHYSICIANS FOR HUMAN RIGHTS & INCLO, *Lethal in Disguise: The Health Consequences of Crowd-Control Weapons* (March 2016)).

[58] App'x. Tab 10, Liz Szabo, *Rubber bullets can kill, blind or maim people for life, but authorities continue to use them*, USATODAY.COM (June 3, 2020, 12:04 p.m.), https://www.usatoday.com/story/news/health/2020/06/03/rubber-bullets-less-lethal-weapons-can-kill-but-still-used/3134019001/.

[59] App'x. Tab 13.

continue the 2020 Protests.[60] However, his presence in Dallas only increases the risk of harm to protesters, bystanders, and journalists alike who will participate in such events: during a phone call with governors on Monday, June 1, Trump encouraged police departments and cities to "dominate" Americans protesting police brutality.[61] "It's a movement that, if you don't put it down, it gets worse and worse," he said.[62] Comparing the ongoing protests to Tiananmen Square in 1990 and Occupy Wall Street protests in 2011, Trump told governors they should treat protesters like "an opponent preparing for war," saying "It's like we're talking about a war— which is a war in a certain sense. . . . And we're going to end it fast."[63] Then, at the President's direction, federal authorities used force—including rubber bullets and flash bangs—to clear what had been, by most accounts, a peaceful protest in Lafayette Square, so Trump could walk to St. John's Episcopal Church.[64] Throughout the 2020 Protests, Trump has even—without evidence—labeled protesters as members of "antifa," a loose network of left-wing militants, including an elderly man in Buffalo, New York, who was pushed backward by police, his head hitting the pavement and sparking national outrage.[65]

---

[60] App'x. Tab 21, Todd J. Gillman & Gromer Jeffers, Jr., *In Dallas, Trump to talk race relations and policing ahead of $10M fundraising dinner,* DALLASNEWS.COM (June 10, 2020, 9:17 a.m.), https://www.dallasnews.com/news/politics/2020/06/10/in-dallas-trump-to-meet-with-police-and-faith-leaders-ahead-of-10m-fundraising-dinner/.

[61] App'x. Tab 22, Aaron Blake, *Despite McEnany's pushback, Trump makes it abundantly clear what he means by 'dominate',* WASHINGTONPOST.COM (June 2, 2020, 9:47 a.m.), https://www.washingtonpost.com/politics/2020/06/02/despite-mcenanys-pushback-trump-makes-it-abundantly-clear-what-he-means-by-dominate/

[62] *Id.*

[63] *Id.*

[64] *Id*

[65] App'x. Tab 23, Chris Cillizza, *Donald Trump's deeply irresponsible conspiracy theory on the Buffalo man injured by police,* CNN.COM (June 9, 2020, 11:02 a.m.), https://www.cnn.com/2020/06/09/politics/donald-trump-martin-gugino-antifa-tweet/index.html.

Mr. Trump's position is clear. He will advocate and Tweet for dominating protestors, which, with the use of KIPs, tear gas, and other "less lethal" weapons, could result in catastrophic consequences for peaceful protestors in Dallas. Plaintiffs intended on protesting during Mr. Trump's visit and this weekend, however, Mr. Trump's threatened use of dominance and the Dallas Polices recent use of KIPS, and chemical agents has paralyzed them from exercising their First Amendment rights.

Specifically, protests are already planned Friday, Saturday, and Sunday in the downtown Dallas area:

- Friday brings a Blue for Black Lives Matter protest at the Jack Evans Headquarters at 11 a.m. Saturday, June 6 PrayingTogether has a peaceful protest at Klyde Warren Park from 10 a.m.–1 p.m. The Dallas Cyclist Community will be going on a silent group ride protest from Dallas City Hall at 11 a.m. Later that afternoon, the Dallas Stand Up For Justice event will take place in Belo Garden Park from 2–4:30 p.m.

- Sunday, June 7, at 11 a.m., there is a Praise and Worship gathering in Downtown Dallas at 133 N. Riverfront Blvd. At the same time, there will be a National Injustice Peaceful Rally at the Jack Evans Headquarters. There will be a Dance Protest on Sunday from 3–7 p.m. at the JFK Memorial Plaza organized by DFW Dance Club.

- In addition, there are protests in the Denton Downtown Square each day at 2 p.m. and 6 p.m.[66]

Given the continual demonstrations against racial injustice and police brutality in Dallas, Texas— and considering the potential for Mr. Trump's visit on June 11 to escalate these protests—the harm suffered by Plaintiffs and those similarly situated is likely to recur.

---

[66] App'x. Tab 24, Natalie Gempel, *Where To Protest This Weekend in North Texas*, DMagazine.com (June 5, 2020, 11:55 a.m.), https://www.dmagazine.com/arts-entertainment/2020/06/where-to-protest-this-weekend-in-north-texas/.

For these reasons, Plaintiffs seek to enjoin the use of these so-called "less lethal" weapons, including projectiles, tear gas, and others, against protesters who are not posing any immediate threat of serious harm to anyone or for crowd control.

## II.   ARGUMENT & AUTHORITIES

### A.   Standard for Temporary Injunctive Relief

A plaintiff seeking a preliminary injunction must show: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) that the plaintiff's threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017).

### B.   Plaintiffs are likely to succeed on the merits of their claims because the DPD's use of allegedly "less lethal" force against non-threatening protesters is unconstitutional.

To establish the first element of likelihood of success on the merits, a "plaintiff must present a prima facie case but need not show that he is certain to win." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011). The first element is assessed by looking at standards provided by substantive law. Id. (citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). In this case, the DPD's continued use of lethal force against protesters who pose no immediate threat of serious harm has chilled the willingness of members of the Dallas community to exercise their First Amendment rights, thereby violating them.

#### 1.   Defendants violated Plaintiffs' First Amendment Rights.

The United States Supreme Court has upheld preliminary injunctions based on the First Amendment where police action "chill[s] the willingness of people to exercise their First Amendment rights." *Allee v. Medrano*, 416 U.S. 802, 810 (1974). The "principal function of free

speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Texas v. Johnson,* 491 U.S. 397, 408–09 (1989) (citation and quotation marks omitted). Organized political protest is a form of "classically political speech." *Boos v. Barry,* 485 U.S. 312, 318 (1988). Further, all citizens have a right to hold and express their personal political beliefs. *See Cohen v. California*, 403 U.S. 15, 24 (1971).

Additionally, and closely related to DPD's use of excessive force in Dallas, the Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley,* 465 F.3d 46, 56 (2d Cir. 2006) (citing *Cox v. Louisiana,* 379 U.S. 536, 550 (1965) ("Cox I"); *Edwards v. South Carolina,* 372 U.S. 229, 237 (1963) (political protest speech is protected even though it invites dispute and may stir people to anger).

To determine whether a governmental restriction on speech violates the First Amendment, courts apply one of two separate tests—either strict scrutiny or intermediate scrutiny. *Worldwide St. Preachers Fellowship v. Town of Columbia*, 245 F. App'x 336, 343 (5th Cir. 2007). The key to deciding which test to apply to the government's conduct is whether the restriction was content-based, in which case the strict scrutiny test applies, or content-neutral, in which case intermediate scrutiny applies. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

   a.   **DPD's policies of using excessive deadly force toward protesters cannot survive strict scrutiny, the test that governs here.**

Strict scrutiny applies to laws burdening "core" political speech. *Henry v. First Nat. Bank of Clarksdale*, 595 F.2d 291 (5th Cir. 1979). In particular, "speech to protest racial discrimination is essential political speech lying at the core of the First Amendment." *N.A.A.C.P. v. Claiborne*

*Hardware Co.*, 458 U.S. 886, 915 (1982) (quoting *Henry*, 595 F.2d at 303). Strict scrutiny erects the highest hurdle for government actions, requiring a "compelling" government objective achieved by narrowly tailored and necessary means. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

Here, DPD's use of force has suppressed precisely this type of "core" political speech of Plaintiffs and the thousands of others who have been protesting racial injustice and police brutality during the 2020 Protests in Dallas. Accordingly, DPD's excessive force against protesters must pass strict scrutiny.

DPD's excessive force fails strict scrutiny. In Plaintiff Doyle's case, he says that police officers only told the crowd to disperse and clear streets before indiscriminately firing tear gas and KIPs at him and others nearby.[67] Likewise in Plaintiff Williams' case, the stated reason Chief Hall gave for unleashing KIPs and tear gas and/or smoke bombs on the Bridge June 1 was "to deter and disperse the large crowd on the bridge."[68] But given that officers blockaded protesters from dispersing from the Bridge, and that Hall ordered the hundreds of charges (purportedly for obstructing a roadway) dropped the next day—but only *after* demonstrators were successfully intimidated and deterred from exercising their First Amendment rights. The conduct of DPD officers and Chief Hall suggests that the protest itself—not clearing roadways—was the real subject of the police action. The Bridge incident shows DPD is using tear gas and firing KIPs at protestors *because* they are protesting police brutality, not for road safety concerns.

Even if Chief Hall's purported basis for using lethal force against crowds was to clear roadways, it is not a compelling reason to use lethal force against any non-threatening protester

---

[67] Tab 2 ¶¶ 5–7, 11–14.
[68] Tab 4.

and is vastly outweighed by its effect of quelling protest participants' First Amendment rights. The traditional public forum consists of streets, sidewalks, and parks—places that have "immemorially been held in trust for use of the public . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939); *accord United States v. Grace*, 461 U.S. 171, 177 (1983). Still, Chief Hall defended her decision to have police in riot gear, driving armored vehicles block protestors from the public forums using lethal weapons: "I strongly believe we made the right decisions" to use force.[69]

While DPD and Defendant Hall may argue and believe that use of excessive force was appropriate "to deter and disperse," protest crowds, their presumed compelling government interest of safety concerns is pretextual. The video evidence shows that the indiscriminate use of excessive force was not narrowly tailored and a necessary means for achieving this interest. As such, the parties are likely to succeed on the merits of their First Amendment claims under strict scrutiny, and the Court should restrain the DPD from these future actions.

**b.    Even if intermediate scrutiny applied, DPD's policies of using excessive deadly force toward protesters could not survive.**

Intermediate scrutiny requires the government to demonstrate that:

(1) the restriction is within the constitutional power of the government;
(2) the restriction furthers an important or substantial governmental interest;
(3) the governmental interest is unrelated to the suppression of free expression; and
(4) the  incidental restriction on First Amendment freedoms  is  no  greater  than  is essential to the furtherance of that interest.

*World Wide St. Preachers Fellowship v. Town of Columbia,* 245 F. App'x 336, 343–44 (5th Cir. 2007) (citing *United States v. O'Brien,* 391 U.S. 367, 377, (1968); *Horton v. City of Houston,* 179

---

[69] *Id.*

F.3d 188, 194 (5th Cir. 1999)). Courts often shorten this inquiry into whether the restriction is narrowly tailored to serve a significant government interest and leaves open alternative channels of communication. *Id.*

Even if the City's interest in the safety of its streets is substantial, the City does not have the constitutional power to use force without probable cause or in excess of the amount of force needed to achieve safety. Blocking or dispersing a protest before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation. *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 180-81 (1968). And, even assuming the City's interest was in protecting properly or property from the few individuals that were not entirely peaceful, shooting KIPs or tear gas into a crowd, as police did in Plaintiffs' cases, does not even target the individuals police claim are presenting a threat.

Threatening and using lethal force against a mostly non-threatening crowd is far beyond what is necessary to clear roadways. Even if, protests had turned violent, shooting tear gas and rubber bullet KIPs into a crowd does not properly target those who are committing violence and is not narrowly tailored to restricting or suppressing the insurrection. Moreover, the Ms. Williams' testimony along with photographic and video evidence reveal no threatening behavior, only peaceful protesters exercising their free speech rights. And in Plaintiff Doyle's case, he says that protesters were peaceful when police officers opened fire on Doyle who, with a camera in one hand and a phone in the other, never posed any threat to anyone and had complied with orders, moving from the street to a parking lot.[70]

---

[70] Tab 2 ¶¶ 5–7, 11–14.

This again suggests the real government interest was suppressing free expression itself. There is no question that the Defendant's use of excessive force to chill and outright prevent Plaintiffs from demonstrating or documenting such is a violation of their First Amendment rights, even under intermediate scrutiny. Thus, the Court should restrain the DPD from these future actions.

### 2.    Defendants violated Plaintiffs Fourth Amendment Rights.

Plaintiffs have shown a significant likelihood of success on their Fourth Amendment claims. The Fourth Amendment guarantees the right to be free from excessive force. *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam); *see also Cole v. Hunter*, 68 F. Supp. 3d 628, 642 (N.D. Tex. 2014). Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). It is beyond debate that, even when a person  "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 2 (1985). But when facts do not clearly show an immediate threat of harm, using deadly force is objectively unreasonable. *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. Aug. 20, 2019) (reh'g en banc) (warning before using lethal force, along with "risk assessment and de-escalation" are also critical).

In Dallas, Plaintiffs' testimony, taken with videos and photos of protests at the Bridge, lay bare the unreasonableness of Defendants' conduct. The videos do not show split-second judgments, but instead responses after ample time for reflection—at least two minutes in the case of the Bridge incident. The police in these videos are not responding to some public safety need, but instead acting with the intention of threatening and inflicting pain to deter the protesters.

The KIPs are inherently lethal because they cause serious and significant loss of limbs and even death. Likewise, tear gas can blind or kill people through respiratory failure or exacerbate respiratory conditions like Covid-19. Accordingly, and even if the Dallas Police had probable cause, the use of "less lethal" weapons like KIPs and tear gas is still unreasonable. As *Garner* instructs, because facts do not clearly show the protesters being injured posed an immediate threat of harm, DPD officers' use of such deadly force was objectively unreasonable.

## C.   Plaintiffs will suffer irreparable harm.

To satisfy the second element of the preliminary injunction standard, the plaintiff must show "that if the district court denied the grant of a preliminary injunction, irreparable harm would result." *Janvey*, 647 F.3d at 600 (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). Injuries are irreparable only when they "cannot be undone through monetary remedies." *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008) (citation omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "The threat of sanctions may deter [the exercise of First Amendment rights] almost as potently as the actual application of sanctions." *World Wide St. Preachers Fellowship*, 245 F. App'x at 343 (citing, *NAACP v. Button,* 371 U.S. 415, 433 (1963); *see also Aebisher v. Ryan,* 622 F.2d 651, 655 (2d Cir. 1980)) ("Where the use of coercive power is threatened, First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.").

Here, Plaintiffs' free speech to express protests is already chilled and continues to be suppressed by the threat of excessive force. Each day, police officers use force, secure in the

knowledge that a civil rights case will take years to pursue. But the necessity of Plaintiffs' demonstration, and their speech, is deeply rooted in the time and context in which it is expressed. Additionally, there is a clear injury if police are permitted to continue a weeks-long campaign of excessive force directed at silencing citizens who are calling out the very abuse and brutality to which the police are subjecting them.

President Donald Trump has publicly made known and encouraged police to "dominate" those protesting police brutality and racial injustice across cities nationwide. Mr. Trump is scheduled to be in Dallas, Texas on Thursday evening, June 12, 2020, and Plaintiffs desire to protest several political matters including police brutality. However, the Dallas Police have already used KIPS as a means of dominance and control, which is excessive to the need. Now with the Mr. Trump promoting dominance the threat of using excessive force to quell First Amendment speech is inevitable. Moreover, while Chief Hall has outlined changes to the DPD's use of force policies, she has not done the same for KIPs and other riot control devices as "crowd control"—or even announced that she will review whether they can be used at all in a safe constitutional manner. Chief Hall has not suggested any polices regarding the use of "less lethal" weapons. Accordingly, Plaintiffs have suffered and will continue suffer irreparable harm if an injunction does not issue.

**D.     A preliminary injunction will not cause any harm to the City of Dallas.**

The third element requires a preliminary injunction applicant to show that the threatened injury outweighs any harm the injunction might cause. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008). In the context of the First Amendment, the City cannot meet even an intermediate scrutiny test, let alone a strict scrutiny test for content-based restrictions.

Therefore, the harm of any perceived governmental is significantly outweighed by the harm to First Amendment activists.

The DPD's excessive force is also ineffective in that it is not targeted at apprehending agitators and lawbreakers. If DPD's aim is to control the crowd and apprehend agitators, it should do that. Launching smoke bombs, firing rubber/sponge bullets, and gassing peaceful protestors does no such thing. Moreover, daily protest events like the one at the Bridge have been entirely peaceable. Because of the number of incidents in Dallas that have not posed *any* threat of harm—let alone the immediate threat of serious harm lethal force requires—restraining DPD officers from using lethal KIPs, tear gas, and similar riot control devices against peaceful protesters will not harm Defendants and will, in fact, greatly benefit public safety.

To permit Dallas Police to continue to violate the rights of demonstrators and to inflict grievous bodily injury on them would impose a serious threat of injury on Plaintiffs. The weight of the denial of the constitutional right to free expression is a significant injury. And the risk of the loss of further eyes, more broken skulls, and more severely injured demonstrators significantly outweighs Defendant's harm—which would be limited only to not being able to deny constitutional rights and not being permitted to use excessive force against its own citizens to whom DPD swore an oath to serve and protect.

**E.     The balance of equities and public interest weigh in favor of an injunction.**

The fourth and final element requires a preliminary injunction applicant to show that the injunction is in the public interest. *Brown v. DFW Gateway Oaks Apartments LLC*, No. 3:19-CV-1928-B-BH, 2020 WL 1942139, at *2 (N.D. Tex. Apr. 6, 2020), *report and recommendation adopted*, No. 3:19-CV-1928-B-BH, 2020 WL 1940568 (N.D. Tex. Apr. 22, 2020) (citing, *Winter*,

555 U.S. at 20). District courts in the Fifth Circuit routinely agree, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Daves v. Dallas Cty., Texas*, 341 F. Supp. 3d 688, 697 (N.D. Tex. 2018); *Texas Democratic Party v. Abbott,* No. CV SA-20-CA-438-FB, 2020 WL 2541971, at *33 (W.D. Tex. May 19, 2020)  (and it is in the public interest not to prevent the State from violating the requirements of federal law). *See also, Gbalazeh v. City of Dallas, Texas*, No. 3:18-CV-0076-N, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019). "Loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury." *Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). In granting a similar temporary restraining order on June 5, 2020, a district court in the Tenth Circuit opined, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Abay v. City of Denver*, No. 20-CV-01616-RBJ, 2020 WL 3034161 (D. Colo. June 5, 2020) (finding that "citizens would suffer irreparable injury if the request for temporary restraining order was denied"); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

Here, the City may argue that it is within the public's interest to prevent the destruction of property and maintain safety in Dallas. While this is true, it does not outweigh the public interest in issuing a temporary restraining order. *Abay,* 2020 WL 3034161, at *5 ("Although I do not agree with those who have committed property damage during the protests, property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice.")  In addition, there was no destruction of public or private property occurring on the Bridge. And, even if there were property destruction, that alone would never justify lethal force in the first place.

Furthermore, preventing destruction and maintaining safety does not outweigh the requirements to use objectively reasonable force. The KIPs and weapons like tear gas are lethal and cause significant bodily injury, such use of force is not narrowly tailored to achieving any governmental purpose. Moreover, the need to maintain safety does not render the requirements of the Fourth Amendment obsolete. Accordingly, as the district court in *Abay* found, a temporary restraining is in the public's best interest.

### III.   CONCLUSION

Plaintiffs request the Court exercise its discretion under Fed. R. Civ. P. 65(c) to waive the bond requirement. *Ghalazeh v. City of Dallas, Tex.,* No. 3:18-CV-0076-N, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) (The Court exercises its discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement, as Plaintiffs are engaged in "public-interest litigation" to protect their constitutional rights. *City of Atlanta v. Metropolitan Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981).

Second, Plaintiffs request the Court issue a temporary restraining order enjoining the use of "less lethal" weapons such as tear gas, smoke bombs, flash-bangs, pepperballs, and mace, as well as what are known as "kinetic impact projectiles" (or "KIPs") such as rubber, sponge, and foam bullets, against protesters who are not posing any immediate threat of serious harm to anyone and/or for crowd control. Plaintiffs request this order to continue until a permanent preliminary injunction hearing is conduct or becomes moot. Plaintiffs further request any other relief to which they may be entitled in law or equity.

Submitted: June 11, 2020

Respectfully Submitted,

By:*/s/ Jessica Foster*
**Michelle Simpson Tuegel**
TX Bar No. 24075187
*Admitted*
**THE SIMPSON TUEGEL LAW FIRM**
3301 Elm St.
Dallas, Texas 75226
214-774-9121 (P)
214-614-9218 (F)
michelle@stfirm.com

**Daryl K. Washington**
TX Bar No. 24013714
*Admitted*
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883 (P)
214-751-6685 (F)
dwashington@dwashlawfirm.com

**Daniel A. Dailey, Esq.**
IL Bar No. 6312616
*Admitted*
ddailey@kingdomlitigators.com
**Tatiauna J. Holland, Esq.**
TX Bar No. 24090519
*Pro Hac Vice Admission Pending*
tjh@tjhollandlaw.com
**Adam Greenfield**
TX Bar No. 24075494
*Admitted*
**KINGDOM LITIGATORS, INC.,**
*A Public Interest Law Firm*
100 Crescent Court Ste. 700
Dallas, Texas 75201
(214) 422-9350 (P)
(469)736-0022 (F)

**Morgan A. McPheeters**
TX Bar No. 24081279
*Admitted*
MCPHEETERS LAW, PLLC
4447 N. Central Expy., Suite 101 #158
Dallas, Texas 75205
469-862-8233 (P)
morgan@mcpheeterslaw.com

**Jessica Foster**
TX Bar No. 24094123
*Admitted*
1408 N. Riverfront Blvd., Suite 241
Dallas, Texas 75207
(214) 865-9742 (P)
jfoster@jfosterlegal.com

**George Oginni**
TX Bar No. 24108191
*Pro Hac Vice Admission Pending*
LEO & OGINNI TRIAL LAWYERS, PLLC
3801 Kirby, Suite 605
Houston, Texas 77098
(713) 280-3204 (P)
george@helpishere.law

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, this Court's Local Rules, and agreement of counsel, the foregoing *Brief in Support of Plaintiffs' Motion for Temporary Restraining Order* was electronically served on the following via email on June 11, 2020:

**Christopher Caso**
City Attorney
chris.caso@dallascityhall.com
**Tatia R. Wilson**
Executive Assistant City Attorney
tatia.wilson@dallascityhall.com
**DALLAS CITY ATTORNEY'S OFFICE**
1500 Marilla St., 7DN
Dallas, Texas 75201
(214) 671-9553 (P)
(214) 670-0622 (F)

*/s/ Morgan A. McPheeters*
Morgan A. McPheeters