IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TASIA WILLIAMS, VINCENT DOYLE, BRANDON SAENZ, AND RANDI ROGERS, | § § § § | |
| Plaintiffs, | § § | |
| vs. | § § § | CIVIL CAUSE NO. 3:20-cv-01526-G |
| CITY OF DALLAS, TEXAS, CHIEF ULYSHA RENEE HALL, RYAN MABRY, VICTOR ROCHA, MELVIN WILLIAMS, AND JOHN DOE POLICE OFFICERS 1–50, | § § § § § § | |
| Defendants. | § § | |

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT & JURY DEMAND

---

COME NOW, Plaintiffs Tasia Williams, Vincent Doyle, Brandon Saenz, and Randi Rogers and bring this civil action against the City of Dallas, Texas, a political subdivision, Chief Ulysha Reneé Hall in her individual capacity, and Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police Officers 1–50 in their individual capacities, and for cause would show the Honorable Court as follows:

## I. INTRODUCTION

1.      In the wake of the brutal and unjustified May 25, 2020 killing of George Floyd by police officers in Minneapolis, Minnesota, hundreds of thousands of Americans took to public streets and forums to protest police brutality and racial inequality. Dallas was no exception, with peaceful protests occurring across the city for at least 100 straight days beginning May 29, 2020,

and continuing throughout the remainder of 2020 (collectively referred to as the "2020 Protests"). Undeterred by the fact that police officers' use of excessive force was the very subject of these demonstrations, City of Dallas Police Department ("Dallas Police" or "DPD") officers repeatedly used extreme and lethal force against these crowds, targeting peaceful, non-threatening protesters and bystanders with tear gas, smoke bombs, flash-bangs, Pepper Balls, mace, and what are known as "kinetic impact projectiles," or "KIPs." And without regard to the ongoing global pandemic involving respiratory disease COVID-19, police have tear-gassed and smoke-bombed protesters, many of whom may have already been infected with COVID-19, making them more likely to suffer simply because they exercised their First Amendment rights.

2.     Kinetic impact projectiles, which include so-called "rubber bullets" or "sponge bullets," are often used by American police forces to control crowds. The manufacturers, distributors, and sellers of these projectiles—and the police departments that use them against their own citizens—praise these bullets as being "nonlethal" or "less lethal." They are not. In fact, these KIPs kill approximately three percent of all people they strike.

3.     Plaintiffs Vincent Doyle, Tasia Williams, and Brandon Saenz are Black Americans and residents of Texas. During the period from May 30 to June 1, 2020, these Plaintiffs each peaceably attempted to exercise their First Amendment rights by participating in the 2020 Protests for reforming policing tactics and resolving racial injustice in Dallas. Plaintiff Randi Rogers, also a Texas resident, did not directly participate in the May 30, 2020 Protests but was simply in the area to observe these historic demonstrations. That weekend, each of these Plaintiffs became victims of the very same unjustified and horrific police brutality the ongoing 2020 Protests opposed. Specifically, Plaintiffs were all seriously injured when Dallas Police officers, unprovoked, shot

them with so-called "less lethal" rubber or sponge bullet KIPs. Over the course of three days in Dallas, Plaintiff Doyle's cheek was shattered, Plaintiff Williams was left bleeding and handcuffed in the middle of a bridge for several hours while suffering from a massive contusion, Plaintiff Saenz permanently lost his left eye after being shot in the eye, and Plaintiff Rogers was left with a huge hole in her scalp. Many other people were also severely injured by these "less lethal" bullets in Dallas during those three days, including a young woman who was shot in the forehead while walking home from a grocery store.

4.      This is a civil action for monetary relief for injuries Plaintiffs sustained as a result of the acts and omissions of Defendants the City of Dallas, Former Chief of Police Reneé Hall, Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Officers 1-50. These Defendants, both individually and collectively, were responsible for the excessive use of force against Plaintiffs and their physical injuries and constitutional violations of their First, Fourth, and Fourteenth Amendments. These injuries are the direct result of official policies of the City and failures by the City and Former Chief Hall to implement and enforce policies and standards that ensure Dallas Police officers know and are trained in the constitutional limits of force against civilians, particularly those exercising their First Amendment rights.

5.      In addition to this action for monetary relief, Plaintiffs also seek in this lawsuit an injunction against Defendants to enjoin them from any future use of tear gas, other chemical agents, and rubber or sponge bullets KIPs. In advance of a planned June 11, 2020, fundraising visit to Dallas by President Donald Trump—which was likely to spur continued demonstrations and potentially more hospitalizations or deaths, either from the projectiles or from the gas—Plaintiffs sought an emergency temporary restraining order from this Court. Plaintiffs' request for an

emergency temporary restraining order was filed conjunctively with Plaintiff's Original Complaint on June 11, 2020. On June 11, 2020, the Court entered an Agreed Preliminary Injunction, which was later extended several times at Plaintiffs' requests. Plaintiffs continue to seek permanent injunctive relief in this lawsuit.

## II.    PARTIES

6.      Plaintiff Tasia Williams is an individual resident of Grand Prairie, Texas and a Black American woman.

7.      Plaintiff Vincent Doyle is an individual resident of Frisco, Texas and a Black American man.

8.      Plaintiff Brandon Saenz is an individual resident of Tyler, Texas and a Black American man.

9.      Plaintiff Randi Rogers is an individual resident of Dallas, Texas and a white American woman.

10.     Defendant the City of Dallas, Texas is a political subdivision of the State of Texas and operates and controls the Dallas Police Department. The City of Dallas operates the Dallas Police Department. The City of Dallas funds and operates the Dallas PD which, along with the Dallas City Council and Chief Ulysha Reneé Hall, are responsible for implementing the police department's budget, policies, procedures, practices, and customs, as well as the acts and omissions challenged by this suit. The Dallas PD, under the direction of the Dallas City Council and Former Chief Hall, is also responsible for preventive, investigative, and enforcement services for all citizens of the City of Dallas. Defendant the City of Dallas has been served and has appeared in this case.

11.     Defendant Victor Rocha, upon information and belief, is a resident of Dallas County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of Dallas and Dallas PD.  At all times relevant to this lawsuit, it was Officer Rocha's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the Dallas PD's rules, regulations, policies and procedures, customs and practices relating to detention, arrests and the use of deadly force.  Officer Rocha is being sued in this lawsuit in both his individual and official capacity.   Defendant Rocha may be served with citation at the Dallas Police Department, 1400 Botham Jean Boulevard, Dallas, Texas 75215 or wherever he may be found.

12.     Defendant Ryan Mabry, upon information and belief, is a resident of Dallas County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for the City of Dallas and Dallas PD. At all times relevant to this lawsuit, it was Officer Mabry's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the Dallas PD's rules, regulations, policies and procedures, customs and practices relating to detention, arrests and the use of deadly force. Officer Mabry is being sued in this lawsuit in his individual capacity.  Defendant Mabry may be served with citation at the Dallas Police Department, 1400 Botham Jean Boulevard, Dallas, Texas 75215, or wherever he may be found.

13.     Defendant Melvin Williams, upon information and belief, is a resident of Dallas County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for the City of Dallas and Dallas PD. At all times relevant to this lawsuit, it was Officer Williams's duty and responsibility to treat all persons in compliance with

constitutional and statutory requirements and in compliance with the Dallas PD's rules, regulations, policies and procedures, customs and practices relating to detention, arrests and the use of deadly force. Officer Williams is being sued in this lawsuit in his individual a capacity. Defendant Williams may be served with citation at the Dallas Police Department, 1400 Botham Jean Boulevard, Dallas, Texas 75215, or wherever he may be found.

14.     During all times relevant in this complaint, Defendant Ulysha Reneé Hall was the Chief of Police of the Dallas Police Department, a final policymaker for the Dallas Police Department, with the authority for setting policies, including training of the Dallas Police Officers. Defendant Hall was also the supervisor for Defendants Mabry, Rocha, Williams, and the John Doe police officers at all times relevant in this complaint. Defendant Hall has been served and has appeared in this case.

### III.     JURISDICTION

15.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

16.     Federal jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

17.     The Court has general personal jurisdiction over Defendants the City of Dallas, Chief Ulysha Reneé Hall, Mabry, Rocha, Williams, and John Doe Police Officers 1–50 by virtue of their citizenship and residence in Dallas County, Texas, as well as their continuous and systematic contacts with the state of Texas. Defendant the City of Dallas is a municipality incorporated in the State of Texas. Upon information and belief, Defendants Hall, Mabry, Rocha, Williams, and John Doe Police Officers 1–50 are residents of the state of Texas. Defendant Hall was the Chief of Police

of the Dallas Police Department from 2017 through 2020. Defendants Mabry, Rocha, Williams, and John Doe Police Officers 1–50 are police officers for the Dallas Police Department.

18.     Furthermore, the Court has specific personal jurisdiction over Defendants the City of Dallas, Reneé Hall, Mabry, Rocha, Williams, and John Does 1–50 because Plaintiffs' claims against them arise out of or relate to a contact between them and the State of Texas. Defendants Mabry, Rocha, Williams, and John Does 1–50 used excessive force against Plaintiffs during protests in Dallas, Texas, acting on orders and policies promulgated by Former Chief Hall and City of Dallas policymakers. Plaintiffs' claims against these Defendants arise from that occurrence and Defendants' contact in the state of Texas.

## IV.    VENUE

19.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

20.     Venue in the Northern District of Texas-Dallas Division is proper pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1367 as the incidents that gave rise to this Complaint occurred in Dallas, Texas, within the Northern District of Texas, and all Defendants reside within this district.

## V.    CONDITIONS PRECEDENT

21.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

22.     All conditions precedent have occurred or have been performed. Fed. R. Civ. P. 9(c).

## VI.   STATEMENT OF FACTS

**A.   George Floyd's senseless death at the hands of a Minneapolis police officer in May 2020 again ignites nationwide protests against police brutality.**

23.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

24.   On Monday, May 25, 2020, a Black man named George Floyd was murdered by an officer of the Minneapolis Police Department. The events of Mr. Floyd's arrest and murder were captured on video by multiple bystanders as well as individual officers' body cameras. The videos depicted Mr. Floyd pinned on the street, face down and increasingly unresponsive, while Minneapolis police officer Derek Chauvin knelt on Mr. Floyd's upper back and neck, two officers held him down, and another stood by. All four officers were fired by the Minneapolis PD, and nationwide protests erupted in response to this police brutality. After days of continual protesting, Chauvin was charged with third degree murder. The other three Minneapolis police officers were then charged with aiding and abetting Mr. Floyd's murder, and Chauvin's charge was upgraded to second degree murder after an independent autopsy report confirmed that Chauvin was the cause of Mr. Floyd's death.

25.   Undeterred by the fact that police excessive force was the very subject of these nationwide demonstrations, videos, photos, and reports of police brutality on massive scales at these protests arose in the weeks immediately following Mr. Floyd's death. Here in Dallas, City of Dallas Police Department officers repeatedly used extreme and lethal force against these crowds during the 2020 Protests, targeting peaceful, non-threatening protesters with tear gas, smoke bombs, flash-bangs, Pepper Balls, mace, and ammunition that are known as "kinetic impact projectiles," or "KIPs." And even amid a pandemic respiratory disease, police tear-gassed and

smoke-bombed protesters, many of whom may have already been infected with Covid-19, making them more likely to suffer simply because they exercised their First Amendment rights.



*Photo, Richard Grant, depicting police officers aiming a riot-control device towards protesters in Long Beach, California.[1]*

26.     Kinetic impact projectiles, which include so-called "rubber bullets" or "sponge bullets," are often used by American police forces to control crowds. The manufacturers, distributors, and sellers of these projectiles—and the police departments that use them against their own citizens—praise these bullets as being "nonlethal" or "less lethal." They are not.  In fact, the fatality, morbidity, and significant risks of injuries from KIPs have been well documented. Regardless, in cities across the country, including Dallas, police departments have attempted to quell participation in the 2020 Protests by firing KIPs into crowds, even though five decades of evidence shows such weapons can disable, disfigure, and even kill.[2]

---

[1] Richard Grant, @RichardGrant88, TWITTER (June 1, 2020, 1:28 p.m.), https://twitter.com/richardgrant88/status/1267523353289474048?s=20.
[2] Liz Szabo, *Police using rubber bullets on protestors that can blind, maim or kill*, CNN.COM (June 3, 2020 at 3:54 a.m.), https://www.cnn.com/2020/06/03/health/rubber-bullet-effects-kaiser-partner/index.html; Rohini J. Haar, Vincent Iacopino, Nikhil Ranadive, Madhavi Dandu, Sheri D. Weiser, Abstract: *Death, Injury and Disability from Kinetic*

27.     For instance, in Minneapolis, free-lance photographer Linda Tirado was shot in the eye with a "rubber bullet." "I was aiming my next shot, put my camera down for a second, and then my face exploded," Tirado told *The New York Times* after she was released from the hospital. "I immediately felt blood and was screaming, 'I'm press! I'm press!'"[3] Tirado, a career photojournalist, is now permanently blinded in one eye.[4]



*Photo, Linda Tirado, depicting Ms. Tirado's injuries in Minneapolis (May 30, 2020).[5]*

28.     In Louisville, Kentucky, a television reporter was hit by a pepper ball on live television by an officer who appeared to be aiming at her, causing her to exclaim on the air: "I'm getting shot! I'm getting shot!"[6] A protesting grandmother who was struck with a rubber bullet

*Impact Projectiles in Crowd-Control Settings: a Systematic Review* (Dec. 5, 2017), https://bmjopen.bmj.com/content/7/12/e018154.

[3] Frances Robles, *A Reporter's Cry on Live TV: 'I'm Getting Shot! I'm Getting Shot!'*, NEW YORK TIMES.COM (May 30, 2020, last updated June 4, 2020), https://www.nytimes.com/2020/05/30/us/minneapolis-protests-press.html.

[4] Linda Tirado, *Police Blinded Me in One Eye. I Can Still See Why My Country's on Fire*, THE NEW REPUBLIC (June 4, 2020), https://newrepublic.com/article/158001/police-blinded-one-eye-can-still-see-countrys-fire.

[5] *See* Linda Tirado, @killermartinis, Twitter (May 30, 2020, 1:32 a.m.), https://twitter.com/KillerMartinis/status/1266618525600399361?s=20.

[6] Frances Robles, *supra* n. 3.

between her eyes in La Mesa, California, landed in the intensive care unit.[7] And in Los Angeles, police shot Marine Corps veteran C.J. Montano in the head with "rubber bullets," despite him having his hands in the air.[8] In an interview from his hospital bed, Montano confirmed that the ammunition has caused brain bleeding.[9]

29.    In the immediate days after Mr. Floyd's death, federal courts in several cities, including Portland, Denver,[10] and Oakland[11] began issuing injunctive relief to prohibit police forces from using so-called "less lethal" crowd control tactics on peaceful protesters, such as rubber bullets and tear gas.

**B.    Dallas Police responded to the 2020 Protests with unjustified violence, turning peaceful First Amendment protests into massive, dangerous conflicts with civilians.**

30.    The first Dallas protest in the aftermath of Mr. Floyd's death was on May 29, 2020. On that day for hundreds of days after, peaceful protestors gathered in downtown Dallas to demonstrate against police brutality and racial inequality. Although a small minority of individuals present at the scene of the first weekend of protests engaged in destructive activity, including property destruction, those individuals' behavior was profoundly overshadowed by the thousands of otherwise non-violent, non-threatening demonstrators who peaceably exercised their First

---

[7] Niala Charles, *Grandmother Hit in Head With LMPD 'Less Lethal' Projectile Remains in ICU*, NBC SAN DIEGO.COM (May 31, 2020, last updated June 4, 2020, 11:40 a.m.), https://www.nbcsandiego.com/news/local/grandmother-hit-with-rubber-bullet-remains-in-icu/2337061/?amp&__twitter_impression=true.
[8] *See* @LowkeySinistra, TWITTER (May 31, 2020, 10:03 a.m.), https://twitter.com/LowkeySinistra/status/1267109420955086848.
[9] *See* video of C.J.'s Montano's interview with ABC7, @LowkeySinistra, TWITTER (June 2, 2020), https://twitter.com/i/status/1268022557061480449.
[10] *See* Alta Spells and Madeline Holcombe, *Temporary restraining order prohibits Denver Police from using chemical agents or projectiles against peaceful protesters without supervisor approval*, CNN.com (June 6, 2020 at 5:37 a.m.), https://www.cnn.com/2020/06/06/us/denver-police-restraining-order-protesters-chemicals-projectiles/index.html; Nicole Chavez, *Portland is the latest city to suspend the use of tear gas on protesters*, CNN.com (June 6, 2020 at 9:18 p.m.), https://www.cnn.com/2020/06/06/us/portland-police-tear-gas-protests/index.html.
[11] Andre Torrez, *Judge orders preliminary injunction against Oakland police over crowd control policy*, KVTU.COM (July 29, 2020), https://www.ktvu.com/news/judge-orders-preliminary-injunction-against-oakland-police-over-crowd-control-policy.

Amendment rights. Nonetheless, during the 2020 Protests the Dallas Police Department and other law enforcement departments, at the Dallas PD's and Former Chief Hall's invitation, directed extreme riot control tactics towards entire groups of protesters posing no harm to officers or anyone. Dressed in riot gear and driving armored vehicles, Dallas Police—like police in other cities in 2020—deployed riot control devices against ordinary citizens and journalists alike, without regard to whether the circumstances justified it, and without regard or competence for shooting this "less lethal" weaponry safely.



*Photo, Central Track, depicting protesters marching through Downtown Dallas on June 6, 2020.[12]*

31.    During the first seven days of demonstrations in Dallas triggered by the murder of George Floyd, Dallas Police officers repeatedly used extreme and lethal force against crowds, directly targeting peaceful, non-threatening protestors with KIPs, tear gas, smoke bombs, and

---

[12] Central Track, @central_track, TWITTER (June 6, 2020, 6:53 p.m.), https://twitter.com/Central_Track/status/1269417106203951104?s=20.

other riot control devices that the City and Former Chief Hall praise as "less lethal."[13] In particular, Dallas Police used a type of KIPs called 40mm eXact iMpact extended range "sponge" bullets—often referred to as "rubber bullets"—against protestors, bystanders, and journalists in order to suppress their First Amendment rights, without regard to the constitutional limits on the use of force:



*Photo, Shane McCormick, depicting sponge/rubber bullet that struck Dallas photographer Shane McCormick and tear gas canister fired nearby at protests in Dallas, Texas on May 30, 2020.*

32.     Most upsettingly, Dallas Police used these weapons to assert and show their dominance over protesters and the citizens of Dallas seeking to exercise their First Amendment rights and the journalists and photojournalists who are covering these events. Former Chief Hall even defended her decision to shoot protesters with tear gas—a chemical weapon banned in war[14] but nonetheless used against peaceful American civilians by their own governments and in their

---

[13] Lauren Silverman, *Dallas Police To Try 'Sponge Guns' To Help Avoid Deadly Shootings*, KERA News.org (Apr. 28, 2016), https://www.keranews.org/post/dallas-police-try-sponge-guns-help-avoid-deadly-shootings.
[14] Matt Field, *Why is tear gas banned in war but not from peaceful protests?*, Bulletin of the Atomic Scientists (June 4, 2020), https://thebulletin.org/2020/06/why-is-tear-gas-banned-in-war-but-not-from-peaceful-protests/.

own cities—during the 2020 Protests in Dallas. Hundreds of reports of peaceful protesters, journalists covering protests, and bystanders bleeding and suffering from unwarranted levels of police force threaten to chill participation in ongoing demonstrations in Dallas. Not even the fact that protesters may have been unknowingly infected with the pandemic respiratory disease COVID-19 deterred police from tear gassing and smoke bombing protesters, making it very possible that many people exercising their First Amendment rights could suffer more severe COVID-19 symptoms aggravated by tear gas and smoke bombs if they became infected or were asymptomatic to the disease at the time.[15]

33.     Countless non-threatening people present at the first weekend of 2020 Protests in Dallas from May 30 to June 1, 2020, suffered and continue suffer from injuries caused by the police brutality by Defendants.

### 1.     On May 30, 2020, Plaintiffs Vincent Doyle, Brandon Saenz, and Randi Rogers are injured by Dallas PD officers.

34.     **Plaintiff Vincent Doyle.** Plaintiff Vincent Doyle, an aspiring photojournalist, went to downtown Dallas to film and photograph the protests on May 30, 2020.[16] When he arrived and headed to the area near Bank of America, Mr. Doyle said the event was entirely peaceful, with approximately 100 to 200 people kneeling and chanting together. Suddenly, officers told the crowd to disperse and began indiscriminately firing tear gas at the crowd. Mr. Doyle stepped behind police to load more film into his camera, where he had a chance to observe officers' response to what was happening. Instead of expressing concern for citizens' safety, some officers were eating pizza and

---

[15] Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On—Especially During the Coronavirus Pandemic*, PROPUBLICA.ORG (June 4, 2020, 12:25 p.m.), https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic.
[16] See Vincent Doyle interview with Dallas Weekly News (@dallasweekly), INSTAGRAM, https://www.instagram.com/p/CBCNvDupZ09/ (last visited June 9, 2020).

laughing together. Meanwhile, Mr. Doyle saw protesters being tear gassed, who then frantically tried to alleviate the symptoms and burning of the chemicals by pouring milk in their eyes. He also witnessed people experiencing homelessness who were shot with rubber bullets along with the protesters, as others tried to give aide to them.

35.    Later, in compliance with police instructions to clear the streets, Mr. Doyle moved to a public parking lot. There, Defendant Melvin Williams shot Mr. Doyle in the face with a sponge/rubber bullet KIP. As Mr. Doyle heard more projectiles and tear gas being fired around him, blood poured from his face. Mr. Doyle screamed, trying to warn protesters that more tear gas could be coming and began recording video with his phone.



*Photos of Plaintiff Vincent Doyle's injuries*[17]

---

[17] Leo & Oginni Trail Lawyers, PLLC, FACEBOOK (June 2, 2002, 12:12 p.m.), https://www.facebook.com/helpisherelaw/posts/167364944753818.

36.     Numerous other protesters came to Mr. Doyle's side to rush him to the hospital in their car but faced a roadblock, where police said they must await an ambulance indefinitely. At that point, Mr. Doyle felt tired and like he might pass out because he had lost so much blood. Instead, Dallas police officers demanded Mr. Doyle's identification and tried to convince Mr. Doyle to incorrectly admit that he had been instead hit with a *brick* thrown by some *other protester* instead of a sponge/rubber bullet shot by police—which was completely inconsistent with what Mr. Doyle saw, heard, and experienced.

37.     The KIP left Mr. Doyle with approximately 40 percent visibility in his left eye and smashed his left cheekbone, which will likely require him to undergo surgery to have a metal plate implanted, with even further surgery and medical care likely required in the future. The brutality against Mr. Doyle has caused him immense physical, emotional, and mental pain, has disfigured his face, and left him physically impaired and unable to work—problems that will continue as he faces ongoing surgery and treatment, currently and in the future. As a result of his injuries, Mr. Doyle has had to undergo to major surgeries and is expected to undergo a third surgery in the near future. Mr. Doyle remains a dedicated aspiring photojournalist and through the fear, anxiety and emotional distress caused by Defendants remains dedicated to observing and recording the ongoing protests in a peaceful exercise of his First Amendment rights. If physically able, Mr. Doyle said he would have returned to the 2020 Protests and protest in the future in Dallas if he knew that Dallas Police were prohibited from using the KIPs and other riot control devices and techniques against non-threatening protestors or in a manner that threatens his constitutional rights.

38.     **Plaintiff Brandon Saenz.** The same day—May 30, 2020—26-year-old Brandon Saenz was walking from the dog park near Dallas' main library downtown to look for his friend,

when he was shot in the eye with a sponge or rubber bullet by Defendants Ryan Mabry, Victor Rocha, and Melvin Williams for no justifiable reason.  At no time was Mr. Saenz a threat to the Defendant officers or any other person.  At no time did any of the officers attempt to administer aid to Mr. Saenz after shooting him in the eye. Mr. Saenz had not and was not committing a penal offense when he was shot in the eye.

39.     Within the first week after being shot by Defendants Mabry, Rocha, and Williams, Mr. Saenz, like Mr. Doyle, underwent several surgeries to his head and face to repair the damage caused by the bullet. The left side of Mr. Saenz's face was fractured.  Mr. Saenz required reconstructive surgery on his eye socket, suffered at least two badly chipped teeth, and had to have 27 staples on the top and side of his head. And tragically, Mr. Saenz has permanently lost his left eye as a result of the shooting. Doctors implanted metal plates in his face, screws in his nose, and a drain tube in his head to prevent blood clotting. Mr. Saenz will need additional medical treatment in the future as a result of his catastrophic injuries.[18] Mr. Saenz continues to experience severe pain from the injuries caused by the incident.



---

[18] *Dallas Protester Undergoes Multiple Surgeries After Being Shot With Rubber Bullet*, DALLAS POLICE, NBCDFW.COM (June 4, 2020, 6:42 p.m.), https://www.nbcdfw.com/news/local/dallas-protester-undergoes-multiple-surgeries-after-being-shot-with-rubber-bullet/2382882/.

*Photo still of Brandon Saenz's injuries taken from WFAA.com video (June 3, 2020, 6:19 p.m.).[19]*

40.     **Plaintiff Randi Rogers.** Also on May 30, 2020, Plaintiff Randi Rogers planned to meet friends in downtown Dallas to attend the demonstrations. Ms. Rogers and her friends planned to observe and support the historical protests, rather than directly participate in them. When Ms. Rogers and her friends parked and started walking, Ms. Rogers observed that the area around her seemed calm, with police simply standing by, albeit equipped in riot gear. When officers directed the group of friends and Ms. Rogers to walk a certain way, they complied. As she walked, Ms. Rogers paused and turned around with her phone to take a photo of the riot-gear-clad police. It was then that a Dallas PD officer fired a gun at Ms. Rogers, striking a blow to her head. Ms. Rogers hit the ground, crying and pleading to know why the officer had shot her.

41.     As blood gushed down her face, Ms. Rogers believed she was dying. Ms. Rogers pleaded for help from a nearby female police officer, who told Ms. Rogers to sit down. Ms. Rogers' friends stayed by her side, refusing to leave her behind. However, other Dallas Police officers who spotted the group of friends did not offer help. Instead, the officers trampled over Ms. Rogers while pepper spraying her friends. Another civilian—who was also waiting for medical attention—gave Ms. Rogers a shirt to wrap around her headwound to slow the bleeding.

42.     Ms. Rogers was eventually taken from the scene of the shooting to a nearby hospital, where she received medical treatment for her headwound. Ms. Rogers later had to undergo reconstructive surgery in an attempt to repair the massive hole in her scalp caused by the bullet.

---

[19] Kevin Reece, *Man who lost an eye to a projectile during Dallas protests demands answers from police*, WFAA.COM (June 3, 2020, 6:19 p.m.), https://www.wfaa.com/article/news/local/man-who-lost-an-eye-to-a-projectile-during-dallas-protests-demands-answers-from-police/287-8b8c4ca8-84bc-4afa-bfcd-a8fcd926c260.

The injuries that Dallas PD inflicted on Ms. Rogers, a hair and makeup artist by trade, have impacted her ability to do her job and have caused her severe pain and mental anguish.



*Photo, Randi Rogers, depicting Ms. Rogers' post-surgical headwound.*

**2.      On June 1, 2020, Plaintiff Tasia Williams is injured by Dallas PD officers.**

43.      Then on Monday, June 1, 2020, Dallas Police detained approximately 674 protesters on the Margaret Hunt Hill Bridge (the "Bridge") at the end of a march from the Frank Crowley Courts Building downtown that was, by all accounts, entirely peaceful. Video footage taken by march participants and journalists confirms: the *only* violence on the bridge came from Dallas Police officers who fired so-called "less lethal" rubber bullets at nonthreatening, kneeling demonstrators, along with smoke bombs and tear gas.[20] Assessing the incident the next day,

---

[20] *See* Matt Goodman, *The Worst City Council Meeting Dallas Has Witnessed in a Decade*, DMAGAZINE.COM (June 6, 2020 12:33 p.m.), https://www.dmagazine.com/frontburner/2020/06/the-worst-city-council-meeting-dallas-has-witnessed-in-a-decade/.

Former Chief Hall said, "I strongly believe we made the right decisions to deter and disperse the large crowd on the bridge."[21]

44.    But the Dallas Police did *not* "deter" or "disperse" the crowd and instead *prevented* participants from leaving by blockading them onto the bridge, a technique called "kettling."[22] When the crowd's march from downtown reached the intersection with the roadway leading to the bridge, demonstrators found the westbound ramp onto the bridge was not blocked by police, unlike other sides of the intersection. Protesters and journalists on the scene say they were told by officers to "continue moving" but were never warned not to walk up the ramp.[23] Once the last of the marchers were on the bridge, police in riot gear and armored vehicles enclosed protesters on both ends, trapping them on the bridge over thirty feet above the ground.[24]



*Photo, Dylan Hollingsworth, protesters march south from Riverfront Blvd. past police, turning westward onto Margaret Hunt Hill Bridge, (June 1, 2020)*[25]

---

[21] *Id.*

[22] Silas Allen, *Kettling Tactic Dallas Police Used Against Protesters is Steeped in Controversy*, DALLAS OBSERVER (Jun 8, 2020, 4:00 a.m.), https://www.dallasobserver.com/news/dallas-police-protesters-kettling-margaret-hunt-hill-bridge-11916828.

[23] *Id.;* Goodman, *supra* n. 19.

[24] Tim Cato, *I was Detained in Dallas' Bridge Raid. It Never Needed to Happen*, DMAGAZINE.COM (June 3, 2020, 3:44 pm), https://www.dmagazine.com/frontburner/2020/06/i-was-detained-in-dallas-bridge-raid-it-never-needed-to-happen/.

[25] Pete Freedman, *A Few Words on the Ambush at Large Marge*, CENTRALTRACK.COM (June 8, 2020), https://www.centraltrack.com/a-few-words-on-the-ambush-at-large-marge/.

45.     Video from the leading edge of the westward march shows that as the group approached the center of the bridge, a solid line of police clad in riot gear met them at the bridge's apex, stopping the march in its tracks.[26] Protesters could all be seen frozen with hands raised, chanting, "Hands up! Don't shoot!"



*Photos, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).[27]*

46.     As the line of police continued to advance eastward toward them, the group kneeled.[28] But police continued marching toward the kneeling protesters. Over a minute passed as police closed the gap, coming less than 20 to 30 feet from the group, even as protesters periodically stood to back up before kneeling again. Suddenly and without warning or any provocation, police launched canisters directly at protesters, which caught fire before releasing smoke or tear gas into the crowd.[29] At about the same time, tactile weapons could be heard firing, as the peaceful crowd screamed. As the crowd continued to back away from the gas and police, the police line kept marching toward them, shooting projectiles at the retreating protesters.[30] As protesters peacefully

---

[26] @thatgirljacqs, TWITTER (June 2, 2020), https://twitter.com/thatgirljacqs/status/1268002580602421248, :09.
[27] *See* Freedman, *supra*, note 23.
[28] @thatgirljacqs, TWITTER, *supra* note 28, at :15.
[29] *Id.* at 1:18; Tim Cato, *I Was Detained in Dallas' Bridge Raid. It Never Needed to Happen*, D Magazine (June 3, 2020, 3:44 p.m.), https://www.dmagazine.com/frontburner/2020/06/i-was-detained-in-dallas-bridge-raid-it-never-needed-to-happen/.
[30] @thatgirljacqs, TWITTER, *supra* note 28, at 122–1:57.

attempted to retreat, they could be heard pleading: "This is a peaceful protest! We're peaceful!"

". . . Peaceful!!"[31]



*Photo, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).*[32]



*Photo, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).*[33]

---

[31] *Id.* at 1:58–2:09.
[32] *See* Freedman, *supra*, note 26.
[33] *See* Freedman, *supra*, note 23.

47.     Having "seen nonviolent protesters in virtually every state get gassed, shot at, beaten, and arrested over the weekend," the members of the march knew not to resist the police in any way: "Instead, we knelt. We put our hands up. I think we started chanting, 'Don't shoot.' Local reporters attest we had not committed a single act of violence or destruction the entire night. Moments later, they opened fire on us."[34] Protestors say that, despite Former Chief Hall's claim that police warned protestors that marching onto the bridge would lead to arrest, they never heard that warning.[35] Additionally, to the extent that police officers are sometimes required to make "split second decisions," no such quick or life-threatening decisions were required on the Bridge that night. Indeed, the Dallas Police officers engaged in a protracted, slow, and coordinated march towards the peaceful protesters, who never acted threateningly or aggressively in any way.



*Photo, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).*[36]

48.     **Plaintiff Tasia Williams.** Plaintiff Tasia Williams was one of the protesters injured on the Bridge by a so-called "less lethal" bullet. Before the tragic turn of events on the Bridge,

---

[34] *See* Cato, *supra*, note 22.
[35] *Id.*
[36] *See* Freedman, *supra*, note 23.

Plaintiff Tasia Williams was filled with positivity and hope after two hours of demonstrations at the Frank Crowley Courts Building left her celebrating that she felt part of a community that could change things. Ms. Williams was not at the front of the group on the Bridge when the line of police suddenly opened fire on the group, but as she choked from the erupting smoke or tear gas, Ms. Williams moved to the left side by the bridge railing to record her own video, thinking she was not in the line of fire. Then, as the crowd retreated from police, Ms. Williams was left on the front lines, where officers shot two rubber or sponge bullets directly at her and a friend, striking Ms. Williams in the thigh. Ms. Williams immediately fell to the ground and screamed for medical attention. As the officers advanced, they ignored Ms. Williams' medical needs but proceeded to arrest her regardless, zip-tying her hands behind her back, forcing her to lay on her stomach face-down on the pavement for over 30 minutes while officers zip-tied the hands of the nearly 700 other protesters. At least three hours passed by the time Ms. Williams had received medical attention and was released.

49.     Police then held Ms. Williams for nearly two hours on the bridge—bleeding and in pain—before providing her any medical attention, despite her pleas. Ms. Williams' eyes burned, and her throat hurt for at least 30 minutes as a result of the tear gas shot by the Dallas Police.

50.     After hours of excruciating pain on the Bridge, an EMT from the Dallas Fire Department finally attended to her wound. When the EMT tossed aside the leftover gauze he used to bandage her bloody leg, Ms. Williams asked him to pick it up using a biohazard bag out of concern for transmitting COVID-19, in case she was an asymptomatic carrier of the disease; he was not concerned. By the time police finished processing her at least another hour later, Ms. Williams had temporarily lost the use of her leg. The injury to her leg made it extremely difficult to stand for any

extended period of time. Several days after her injury, the wound from the sponge bullet began to form a keloid in the middle of her leg which will likely require dermatological and other treatment. Ms. Williams continues to suffer from severe emotional distress due to her injuries.

51.     Ms. Williams remains a dedicated activist and even through the fear, anxiety and emotional distress remains dedicated to continuing actively protesting in a peaceful exercise of her First Amendment rights. The incident damaged Ms. Williams' trust in police, the City, and government, and she has seen firsthand the very police brutality she showed up to protest. But despite her own suffering, Ms. Williams said she would have returned to the 2020 Protests in Dallas and would attend future protests in Dallas if she knew that Dallas Police were prohibited from using the KIPs and other riot control devices and techniques against non-threatening protestors or in a manner that threatens her constitutional rights.

52.     These stories are only some of those that continue to emerge from the 2020 Protests in Dallas. Countless other people have been injured by recent police brutality in Dallas, including one woman not affiliated with protests who was walking out of Whole Foods after grocery shopping when police shot her in the face with a projectile.[37]

[*The remainder of this page intentionally left blank.*]

---

[37] *See* Dallas Morning News reporter Kevin Krause, @KevinRKrause, TWITTER (May 30, 2020, 8:04 p.m.), https://twitter.com/KevinRKrause/status/1266898396339675137/.



*Photo, Kevin Krause, a woman injured by projectile in Dallas (May 30, 2020)*[38]

53.     The conduct of the Dallas Police, particularly toward peaceful protestors, shows that Dallas Police are present at protests not simply to prevent property damage and keep the public safe but rather to counter the police brutality protests. Indeed, Dallas Police were and are dressed and armed to use violence against demonstrators and bystanders. It is evident through its militaristic, indiscriminately violent conduct toward peaceful protesters, bystanders, press—and as widely captured on video—that the Dallas Police were not there to serve a public safety role, but instead to dominate the protesters.

54.     Against this backdrop, immediate federal intervention was and continues to be necessary to enjoin the unconstitutional use of excessive force to disperse and suppress peaceful protests.

[*The remainder of this page intentionally left blank.*]

---

[38] *Id.*

**C.      The "rubber" or "sponge" bullets Dallas Police are using can be deadly.**

55.      "Rubber bullets are bullets. Bullets can kill."[39] KIPs—often called "rubber," "sponge," or "foam" bullets—describe a category of ammunition used commonly in crowd-control settings, including Pepper Balls. Some KIPs are made of hardened foam or plastic, often containing a rigid or metal core. Others are "beanbag" type rounds, and others may be composed of rubber or wood.



*Graphic created for Fowers, Steckelberg & Berkowitz, WashingtonPost.com (June 5, 2020).*[40]

56.      "Regardless of their composition, these projectiles are shot out of guns at speeds comparable to that of a typical bullet, and when they hit their target, they can main, blind, or even kill."[41] Although police departments like Dallas often use KIPs in crowd control because they are

---

[39] Brian Resnick, *Rubber bullets can seriously mess you up: The dangers of "nonlethal" police weapons—like rubber bullets, flash-bang grenades, and tear gas—explained*, VOX.COM (June 4, 2020, 9:21 a.m.), https://www.vox.com/identities/2020/6/3/21279047/rubber-bullets-flash-bang-tear-gas-police-protests; Amanda Arnold, *"Rubber Bullets" Are Not Rubber*, THECUT.COM (June 5, 2020), https://twitter.com/mcgrudis/status/1268591923402436609/photo/1.
[40] Alyssa Fowers, Aaron Steckelberg, & Bonnie Berkowitz , *A guide to the less-lethal weapons that law enforcement uses against protesters*, WASHINGTONPOST.COM (June 5, 2020), https://www.washingtonpost.com/nation/2020/06/05/less-lethal-weapons-protests/?arc404=true.
[41] *Id.*

allegedly "nonlethal" or "less lethal," research shows they cannot be used safely. At close range, they "can break bones. They can facture skulls. If they hit the face, they can cause permanent damage and disability."[42] And even at long distances, they "have unpredicted trajectories, they bounce, and they're quite indiscriminate."[43] In fact, some police departments prohibit KIP usage within 165 feet:



*Graphic created for Fowers, Steckelberg & Berkowitz, WashingtonPost.com (June 5, 2020).*[44]

57.    An independent 2017 study found that these projectiles have caused significant morbidity and mortality during the past 27 years, much of it from penetrative injuries and head, neck and torso trauma.[45] Given their inherent inaccuracy, potential for misuse and associated health consequences of severe injury, disability and death, KIPs do not appear to be appropriate weapons for use in crowd-control settings. There is an urgent need to establish international guidelines on the use of crowd-control weapons to prevent unnecessary injuries and deaths.

58.    The findings of the 2017 BMJ study indicate that KIPs have caused serious injury, disability and death. In the 26 studies selected for analysis, researchers identified 1,984 people with

---

[42] *Id.*
[43] *Id.*
[44] *See* Fowers, Steckelberg & Berkowitz, *supra*, note 39.
[45] Haar RJ, Iacopino V, Ranadive N, et al.  *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review.* BMJ OPEN (2017), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/.

injuries, 53 of whom died as a result of their injuries. Among those injured, fifteen percent of the injuries resulted in permanent disability; 3 percent resulted in death.[46] Injuries were to the eyes overwhelmingly (84.2 percent) resulted in blindness. Permanent disabilities and severe injuries often resulted from strikes to the head and neck (48 of deaths and 87% of permanent disabilities). These findings indicate that these "less lethal" weapons still readily cause severe injuries and death.

59.     Accordingly, organizations like Physicians for Human Rights have concluded "KIPs in general are not an appropriate weapon for crowd managements and, specifically, for dispersal purposes. Most cannot be used effectively and safely against crowds. At close ranges, levels of lethality and patterns of injury of some KIPS become similar to those of live ammunition. At longer ranges, KIPs are inaccurate and indiscriminate. Some KIPs are lethal in close range and ineffective at longer distances which make safe use difficult."[47]

60.     That is why law enforcement experts are warning that "[r]ubber bullets should be used only to control "an extremely dangerous crowd," said Brian Higgins, the former police chief of Bergen County, New Jersey.[48] "Shooting them into open crowds is reckless and dangerous," said Dr. Douglas Lazzaro, a professor and expert in eye trauma at NYU Langone Health.

61.     Now lawmakers in Texas and nationwide are calling for a ban on this "less lethal ammunition." Texas State Representative Erin Zwiener said: "We have people in critical condition at the hospital. . . . Even if these aren't as life-ending as often, they're certainly life-

---

[46] *See* Resnick, *supra*, note 37.
[47] Physicians for Human Rights, Kinetic Impact Projectiles Factsheet (2016) (citing PHYSICIANS FOR HUMAN RIGHTS & INCLO, *Lethal in Disguise: The Health Consequences of Crowd-Control Weapons* (March 2016)).
[48] Liz Szabo, *Rubber bullets can kill, blind or maim people for life, but authorities continue to use them*, USATODAY.COM (June 3, 2020, 12:04 p.m.), https://www.usatoday.com/story/news/health/2020/06/03/rubber-bullets-less-lethal-weapons-can-kill-but-still-used/3134019001/.

altering. And I'm not seeing these weapons used with the judiciousness and respect for life that a weapon of the kind requires."[49]

**D.**   **The City's actual policy is to use KIPs and other "less lethal" force in a deadly manner, as long as officers feel it is necessary to control crowds—even if it violates the City's own written polices and the Constitution.**

62.    In response to a Public Information Act request for purchase orders of "rubber bullets," the Dallas Police Department produced a purchase order for 40mm eXact iMpact extended range "sponge" bullets. This further indicates that the Dallas PD refers to "sponge" bullets as "rubber" bullets.

63.    Incredibly, the City of Dallas has never had any specific written policy regarding the use of these sponge bullet or other KIPs fired from the 40mm "Stinger" launchers, even though the Dallas PD has been purchasing them since at least 2013. And officers have shown time and time again that they have never been properly trained—if at all—on when and how the use of these weapons is permitted by the United States Constitution. Yet police in Dallas continue to use these extreme, deadly weapons against passive protestors never posing the immediate risk of serious harm the Constitution requires before officers may consider using deadly force.

64.    These egregious abuses during the 2020 Protests are by no means the first time the City of Dallas and Former Chief Hall have discovered—and then ratified—officers' use of "less lethal" ammunition against peaceful protesters. After Dallas Police used Pepper Balls on a non-threatening crowd during the September 2018 protests following Botham Jean's murder by then-Dallas PD officer Amber Guyger, it became evident that the City knew its officers violated written

---

[49] Nic Garcia, *Texas police deployed less-lethal ammunition to control protests. Now policymakers want to ban the weapons*, DALLASNEWS.COM (June 9, 2020 11:13am), https://www.dallasnews.com/news/2020/06/09/texas-police-deployed-less-lethal-ammunition-to-control-protests-now-policymakers-want-to-ban-the-weapons/.

policies on the use of "less lethal" force and were untrained in the proper use of those weapons for crowd control.

65.     Like the 2020 Protests, none of the Botham Jean-related protestors were threatening any physical violence or property damage when they were shot with Pepper Balls—a direct violation of the Dallas PD's General Orders prohibiting officers from using Pepper Balls unless the crowd was "threatening unlawful property damage or physical force." Indeed, Former Chief Hall admitted that she was concerned when she learned police fired the ammunition with no "immediate threat to the public" to justify their use under the General Orders. "The day after the protest, one of many after Jean's Sept. 6 death, Police Chief U. Renee Hall called for a review of the pepper-ball incident."[50] In a written statement, Former Chief Hall admitted she had knowledge of the excessive force: "I am concerned to learn of reports that one of our officers deployed potentially several pepper balls during a demonstration last night. I have asked our investigative unit to conduct a full review. The use of pepper balls is governed by our General Orders, and they are only to be utilized if instructed to do so by the on-scene commander or if there is an immediate threat to the public. I plan to meet directly with the leadership of the demonstration to address their concerns."[51]

66.     But Former Chief Hall took no action against the officers and instead reinforced the practice, directly resulting in the physical injuries and deprivations of protestors' constitutional

---

[50] Cassandra Jaramillo, *Dallas officer's pepper-ball use during Botham Jean protest deemed 'consistent' with policy*, DALLASNEWS.COM (Dec 28, 2018 6:00 a.m.), https://www.dallasnews.com/news/2018/12/28/dallas-officers-pepper-ball-use-during-botham-jean-protest-deemed-consistent-with-policy/.
[51] Mo Barnes, *Dallas PD's violent response to peaceful protests in Botham Jean shooting* (Sept. 12, 2018), https://rollingout.com/2018/09/12/dallas-pds-violent-response-to-peaceful-protests-in-botham-jean-shooting/.

rights to under the First and Fourth Amendments protestors continue to face in current ongoing protests.[52]

67.     In fact, the General Orders governing the use of Pepper Balls at the time classified Pepper Balls "as hard empty hand control on the DPD Response Continuum," which requires a subject to exhibit only "defensive resistance," not the "aggravated aggression" required for deadly force. That policy, 902.0, further stated that Pepper Balls "[m]ay be used as saturation to disperse unruly or rioting crowds threatening unlawful property damage or physical force." The orders further state that "[t]he Pepper Ball System Area Saturation will not be used on subjects who are passively resisting or who are not posing a physical threat to persons/property to include persons fleeing the scene."

68.     None of the officers involved or Former Chief Hall ever suggested the protesters were threatening unlawful property damage or physical force, or that they ever did more than passively resist, as the policy required. The only stated reason for shooting Pepper Balls at the crowd was "to keep protesters back" as the crowd turned onto Cadiz Street headed for the Dallas Police Association office.[53]

69.     Nevertheless, the preliminary report of the incident review concluded that the use of the Pepper Ball gun "was 'consistent' with the department's general orders."[54] The report also found that the officer seen on video firing the ammunition was not certified to use the gun at the time, and that his "certification on the gun had been expired for a year."[55] And, although Hall did

---

[52] Cassandra Jaramillo, *Chief orders review after Dallas cop caught on video shooting pepper balls at Botham Jean protest*, DALLASNEWS.COM (Sept. 11, 2018, 3:00 p.m.), https://www.dallasnews.com/news/crime/2018/09/11/chief-orders-review-after-dallas-cop-caught-on-video-shooting-pepper-balls-at-botham-jean-protest/#.
[53] Jaramillo (Dec. 28, 2018), *supra,* note 48.
[54] *Id.*
[55] *Id.*

not know the day after the incident whether the officer was instructed to use the weapon by the on-scene commander, the report found that a sergeant had instructed officers "to deny the crowd access to Cadiz Street."[56] Ultimately, "the incident was treated as minor by the department."[57]

70.     By approving of the use of Pepper Balls against a crowd that did no more than passively resist—let alone threaten to damage any property or use physical force—the City ratified the use of "less lethal" ammunition that directly violated the General Orders. The Jean incident showed not only that officers not qualified to use less lethal ammunition are instructed to do so anyway, but that even when that unqualified officer predictably uses the weapon in a way that plainly violates written City policy, City officials simply deny that the policy says what it says. And even though the Jean incident made it plain that officers were in need of training to use these "less lethal" guns for crowd control only in way actually "consistent" with the City's policies, the City has never given officers training on the matter. Regardless of what the City's written policy says, therefore, the City's *de facto* policy allows police to use "less lethal" ammunition against non-threatening crowds, including non-threatening protestors.

71.     Despite knowing that officers were not trained to follow the City's written policies on the Pepper Ball System and having ratified the custom of using such extreme force against non-threatening protestors as official policy, the City of Dallas still chose to purchase and arm officers with another form of "less lethal" ammunition without enacting any general order to ensure the constitutional use of the weapon, or even provide officers any training in how to do so. The City of Dallas has an established pattern and practice of using excessive, potentially lethal force to disperse non-violent peaceful crowds and protestors in Dallas.

---

[56] *Id.*
[57] *Id.*

72.     The City and Former Chief Hall knew from the Jean protests that officers were not trained on the proper use of "less lethal" Pepper Ball KIPs for crowd control when the City contracted to use "sponge rounds." But instead of training officers accordingly, the City added another "less lethal" KIP to officers' arsenal. Even though the "sponge" bullets are even more harmful than Pepper Balls, the City ignored the increased danger they pose citizens by providing officers no additional training on how to use the sponge bullets. And never since 2013, when the City purchased the sponge bullets, has the City or Former Chief Hall established a general order or written policy specific to the more dangerous weapon.

73.     The City can hardly be surprised that when groups gathered again in Dallas in 2020 to protest yet another police killing of a non-resisting, unarmed black civilian, George Floyd, Dallas police officers would again use "less lethal" munitions to control the crowd—ignoring, as it had before, whether the crowd posed any threat of harm, let alone an immediate threat of serious harm to persons. When Dallas Police trapped Plaintiff Ms. Williams and the hundreds of peaceful protesters on the Bridge on June 1, 2020, the crowd that police fired directly into—like crowds in the Jean incident—had not and did not riot and never threatened property damage or physical force, as journalists on the scene and video footage of the events confirm.

74.     The weapons Dallas Police used to control non-threatening crowds of protestors during the 2020 Protests are even more lethal than claimed. The protestors on the Bridge on June 1, 2020, not only knelt and raised their hands, but they were also retreating. Some protesters even turned their backs and began running away from the advancing officers. Still, police stalked and kettled protesters down the Bridge and again shot KIPs directly at protesters, without provocation. Nor did the crowd where Mr. Doyle stood just two nights prior do anything to threaten the safety

of people or property when police directed KIPs and tear gas at protesters. Similarly, Ms. Rogers and her friends were complying with police instructions when an officer shot Ms. Rogers in the head completely unprovoked. In each of these cases, Dallas Police officers purporting to act for the protection of Texas citizens did just the opposite.

75.     However, when faced with plain instances of Dallas Police violating the constitutional limits of force and the City's own written policies, the City and Former Chief Hall have encouraged and defended the practice, deterring protesters from attending future protests. In doing so, the City and Former Chief Hall reaffirmed the City's official unwritten policy and practice of using excessive, potentially deadly, force against non-threatening, peaceful protesters as a means of intimidation and control.

76.     Predictably, peaceful protestors, journalists, and bystanders have suffered serious injuries from the use of "less lethal" KIPs, tear gas, smoke bombs, and other riot control devices designed to quell their exercise of First Amendment rights.

77.     On its face, however, the City's own use of force policy recognizes that treating KIPs and Pepper Balls as anything less than deadly force is unconstitutional. In the 2016 General Orders, the City's Response Continuum Policy 901.04 on "Levels of Control" expressly defines "deadly force" as: "Deadly Force: The use of physical control that will cause death or serious bodily injury." The policy then mandates that "Deadly Force will only be employed in accordance with the Department's Deadly Force Policy (refer to Section 906.00)." As explained above—and as Plaintiffs experienced firsthand—KIPs and Pepper Balls cause serious bodily injury. Thus, Pepper Balls and KIPs from the 40mm launcher should have been defined as deadly force according to the City's other policies. And, because the Constitution bars officers from using deadly force

except where there is an "immediate threat" of harm to the officer or others, by not classifying KIPs and Pepper Balls as deadly force, the City's policies on those "less lethal" weapons are facially unconstitutional.

78.    Furthermore, by failing to train DPD officers to use Pepper Balls and KIPs shot from the 40mm launcher in accordance with the City's deadly force policy—and indeed, actively training officers to use the devices where deadly force would be prohibited by the Constitution and the City's own policy—the City has established that its unwritten policies on KIPs and Pepper Balls are unconstitutional.

**E.    Under pressure from continual public outcry amid the ongoing 2020 Protests in Dallas and nationwide, officials still refused to acknowledge failures.**

79.    In the days after the incident that injured Plaintiffs, Former Chief Hall confirmed what so many citizens and Plaintiffs have known: The City's current use of force policies are insufficient to "address challenges between law enforcement and communities of color."[58] Public outrage over the June 1, 2020 Bridge incident prompted Dallas residents to demand Former Chief Hall's resignation.[59] As Former Chief Hall explained, when Mayor Eric Johnson asked her "Where would you say the buck stops in the Dallas Police Department?" Hall replied: "It stops with me."[60] Former Chief Hall has not recanted her statement defending officers' actions at the Bridge under

---

[58] *Dallas Police Chief Renee Hall Lays Out Plan to Build Trust, Address Use of Force and Racial Bias*, WBAP.COM (June 8, 2020), https://www.wbap.com/2020/06/08/dallas-police-chief-renee-hall-lays-out-plan-to-build-trust-address-use-of-force-and-racial-bias/.

[59] Hady Mawajdeh, P*ublic Anger At Dallas Meeting Focuses On Police Tactics At Margaret Hunt Hill Bridge Protest*, KERANEWS.ORG (June 7, 2020), https://www.keranews.org/post/public-anger-dallas-meeting-focuses-police-tactics-margaret-hunt-hill-bridge-protest?fbclid=IwAR0w_cAsern_R59r0bYtehSXJUF-mN9vJv8ry1cqQBecMrEyR1pU1UCfABc.

[60] Demond Fernandez, *Dallas City Council convenes in special meeting to discuss response to protests*, DALLAS BUSINESS JOURNAL & WFAA (June 6, 2020), *available at* https://www.bizjournals.com/dallas/news/2020/06/06/dallas-city-council-protests.html.

the guise of "protect[ing] protesters from vehicular injury on a roadway still open to traffic."[61] Tellingly, after arresting protestors on the Bridge (purportedly for obstructing a highway or for violating the curfew ordinance; protesters were not clear why they were being arrested), Former Chief Hall dropped charges—but only *after* demonstrators were successfully intimidated and deterred from exercising their First Amendment rights.

80.    In what has been called "the worst city council meeting Dallas has witnessed in a decade," Dallas Mayor Eric Johnson grilled Former Chief Hall about the incident on the bridge and challenging her claim that officers did not tear gas in question.[62] "Hall said tear gas was not fired, that it was smoke. She said she ordered the SWAT team to not fire tear gas. Mayor Johnson then wanted to know the chemical breakdown in the smoke. She could not say. Councilman Adam Medrano said he believed the chief's order to not fire tear gas was disobeyed, because the reactions of those on the bridge was so violent. He demanded that she determine who violated her order."[63]

81.    Across America, cities continue to announce plans to consider significant changes in police protocol and, indeed, whether to limit the extent and funding of police departments as a whole. "A growing number of people suffering serious injuries in Dallas, Austin and across the nation from plastic, rubber and wooden bullets are raising new questions about how and when police officers use these weapons."[64] Then on June 9, Austin's police chief "banned the use of

---

[61] Cassandra Jaramillo & Hayat Norimine, *Dallas Police Chief Reneé Hall says protesters who marched on Margaret Hunt Hill Bridge will not be charged*, DALLASNEWS.COM (June 4, 2020, at 7:11 p.m.), https://www.dallasnews.com/news/courts/2020/06/04/dallas-police-chief-renee-hall-says-protesters-who-marched-on-margaret-hunt-hill-bridge-will-not-be-charged/
[62] Matt Goodman, *The Worst City Council Meeting Dallas Has Witnessed in a Decade*, DMAGAZINE.COM (June 6, 2020 12:33 p.m.), https://www.dmagazine.com/frontburner/2020/06/the-worst-city-council-meeting-dallas-has-witnessed-in-a-decade/.
[63] *Id.*
[64] Garcia, *supra*, note 46.

these weapons for crowd control purposes after a 20-year-old black man, a Latino teenager and a pregnant woman were critically injured."[65]

82.     Under this constant pressure, Former Chief Hall announced on Thursday, June 4, 2020, that she "had instituted a new general order compelling members of the department — both sworn and non-sworn—'to either stop, or attempt to stop, another employee when force is being inappropriately applied or is no longer required.'"[66] Then on Monday, June 8, 2020, Former Chief Hall officially banned chokeholds and "said next week the Dallas Police Department will institute a policy requiring officers to announce warnings before shooting."[67] Then Former Chief Hall said the Dallas PD would institute a policy requiring police to announce warnings before shooting, "to release more dash cam and body cam videos as well as order a review all use of force policies." *Id.* Yet, the policies enacted thereafter still do not address the use of KIPs and other riot control devices as general "crowd control."[68]

83.     On July 22, 2020, Dallas independent news media Central Track reported that Dallas PD had apparently completed its "Preliminary After-Action Report" on the first four days of the 2020 Protests (which Dallas PD calls the "Protests for Equality") as early as June 12, 2020.[69] Despite Plaintiffs' lawsuit being filed on June 11, 2020—and this Court entering a temporary

---

[65] *Id.*

[66] Hayat Norimine, *Dallas' Chief Hall implements 'duty to intervene' policy after calls for greater police accountability*, DALLASNEWS.COM (June 5, 2020 1:04 a.m.), https://www.dallasnews.com/news/crime/2020/06/05/dallas-chief-hall-implements-duty-to-intervene-policy-after-nationwide-calls-for-police-accountability/.

[67] J.D. Miles, *Dallas Police Chief Renee Hall Lays Out More Policies Addressing Use Of Force, Racial Bias*, CBSLOCAL.COM (June 8, 2020, 3:35 p.m.), https://dfw.cbslocal.com/2020/06/08/dallas-police-chief-renee-hall-policies-use-force-racial-bias/.

[68] General Orders 902.00 "Chemical Spray and Pepperball Launcher System" and 908.00 "40MM 'Stinger' Less Lethal Launcher System" (updated July 22, 2020), *available at* https://dallaspolice.net/resources/Shared%20Documents/General-Orders.pdf.

[69] Pete Freedman, *Exclusive: Here's DPD's Unreleased Protest After-Action Report,* CENTRALTRACK.COM (Jul. 22, 2020), https://www.centraltrack.com/exclusive-heres-dpds-unreleased-protest-after-action-report/.

injunction the same day, banning the use of "less lethal" weapons, including KIPs, for crowd control—Dallas PD still had not released the report. After the report was leaked by a City Hall employee, Central Track published it.[70]

84.     Finally, on August 14, 2020, Dallas PD released its final "George Floyd Protests After Action Report" (the "After-Action Report").[71] The After-Action Report reveals several notable details about the first four days of protests:

- Dallas PD admits that "during a review of the use of force and through the recognition that existing General Orders were vague on the deployment of less-than-lethal projectiles during crowd control incidents, General Orders 902.02 and 908.04 were created to ensure Pepperball launchers and 40mm Less Lethal "Stingers" are not deployed into crowds in the future";[72]

- The report also makes "clear mention about the use of teargas on the protesters arrested on the bridge on June 1," despite Former Chief Hall's continued denial that tear gas was used;[73]

- Dallas PD estimates that SWAT officers deployed at least 335 projectiles from the 40mm launcher, 36 Pepper Balls, and 30 tear gas canisters, while claiming that Dallas PD patrol officers used 68 Pepper Balls and 40mm KIPs;[74]

- It is likely that those estimates are low, given that Dallas PD admits it was not fully tracking the police resources it was expending, noting that many officers were "freelancing," which the report then describes as "the spontaneous reaction to an observed need for action." The report notes that such officer activity "made tracking police resources extremely difficult."[75]

- And while Dallas PD admits that "worn body camera footage exists from the officers who worked the protests," the department claims "that the cameras were faulty and

---

[70] Jozelyn Escobedo, *Chief Reneé Hall issues order limiting police use of tear gas, rubber bullets at protests*, WFAA.COM (July 22, 2020, 11:42 a.m.) https://www.wfaa.com/article/news/local/chief-rene-hall-issues-order-limiting-police-use-of-tear-gas-rubber-bullets-at-protests/287-779ce1ce-a1d8-4673-aa4d-ab17747e20f3.

[71] City of Dallas, George Floyd Protests After Action Report (Aug. 14, 2020) ("After-Action Report"), *available for download at* Pete Freedman, *Our Cliffsnotes on DPD's Final Protest After-Action Report*, CENTRALTRACK.COM (Aug. 19, 2020), https://www.centraltrack.com/our-cliffsnotes-on-dpds-final-protest-after-action-report/.

[72] After-Action Report at 26.

[73] Freedman, *supra*, note 72.

[74] After-Action Report at 28.

[75] Freedman, *supra*, note 72.

tough to adhere to their riot gear. It makes no mention of any plans to release this footage";[76]

- Tragically, the report admits that "the standard operating procedure of creating a highly visible officer presence for managing crowd control incited the emotions of the protests";[77]

- Reportedly, the efforts by Dallas PD cost taxpayers "$920,000 in salaries and overtime, $377,000 in goods, equipment and services, and $215,000 in vehicle usage and damage."[78]

85.     Although the City, for the first time, recently enacted a policy regarding the "40mm 'Stinger' Less Lethal Launcher System," the new policy makes plain that the Dallas PD does not hold officers' use of KIPs to a lethal force standard. For instance, the policy permits officers to fire KIPs using the 40mm launcher at a suspect who is "not actively aggressive."[79] But under the Use-of-Force Continuum, deadly force is not permitted even against someone who is actively aggressive; "aggravated aggressive" conduct is required.[80] The policy does not even demand that the suspect pose an actual danger at the time, but rather, allows officers to fire KIPs at a suspect who is "moving to an area that is potentially more dangerous to himself or others."[81] Ultimately, the policy requires no "immediate" threat of harm to shoot the KIPs directly at a person. However, none of these policies address the real problem here: That the City refuses to hold "less lethal" KIPs and Pepper Balls to the standard for lethal force, even though they cause serious injuries and even death.

86.     Upon information and belief, to date, neither the City nor Former Chief Hall have terminated Defendants Mabry, Rocha, Williams, John Doe Police Officers 1-50, or any other Dallas

---

[76] *Id.*
[77] After-Action Report at 41.
[78] *Id.* at 29.
[79] General Orders, *supra*, note 69, at 908.04.
[80] *Id.* at *Linear Use-of-Force Response Continuum.*
[81] *Id.*

Police Officers present or working during the 2020 Protests, nor have they required that these officers be disciplined, have additional supervision, or undergo additional training. By doing so, the City and Former Chief Hall ratified and tacitly approved of their conduct.

## VII.   CAUSES OF ACTION

### Count 1: Civil Rights Claim (42 USC § 1983)
### Violation of First Amendment Rights
### Against the City of Dallas, Ryan Mabry, Victor Rocha, Melvin Williams, and
### John Doe Police Officers 1-50 in their individual capacities

87.     Plaintiffs by reference incorporate and reallege all of the preceding paragraphs as though fully stated herein.

88.     Plaintiffs engaged in constitutionally protected acts of observing, recording, or participating in events of public interest, including public demonstrations and in expressing their political views. Plaintiffs will continue to do so in the future.

89.     In 2018, Former Chief Hall admitted that she knew "less lethal" ammunition was being used against peaceful protestors who were not threatening to commit property damage or physical violence but encouraged and defended the practice because it dispersed the crowds.

90.     The actions of Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers 1-50—namely, the suppression of a peaceful demonstration and the viewpoint it represented—and the actions of Former Chief Hall in ordering such suppression, deprived Plaintiffs of their rights under the First Amendment to the United States Constitution to freedom of speech, freedom of press, freedom of assembly, and freedom to petition the government for a redress of grievances. Defendants deliberately violated well-established limitations on the exercise of speech and assembly in public places.

91.     Defendants retaliated against Plaintiffs for engaging in constitutionally protected activity and for the content and viewpoint of her expressions. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

92.     Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest justifying the infringement of Plaintiffs' First Amendment rights. Even assuming, arguendo, that there had been a compelling government interest in protecting against property damage or clearing streets of protestors, Defendants' actions toward Plaintiffs and the groups of protesters were not narrowly tailored to serve that government interest in a lawful manner.

93.     Plaintiffs reasonably fear the continued indiscriminate use of KIPs and deployment of chemical agents without warning. Plaintiffs further reasonably fear unlawful seizure and excessive force through the firing of flash bang grenades, KIPs and other projectiles, and other means if Plaintiffs and protesters continue to engage in constitutionally protected activity.

94.     These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs from continuing to observe and record some events of public interest and to participate in peaceful protests. Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs.

95.     It was the City of Dallas' custom and policy, as well as the City of Dallas' and Former Chief Hall's failure to train and supervise Dallas Police officers and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

96.     Defendants' continued failure to supervise and train Dallas Police officers with respect to the First Amendment rights of Plaintiffs amounts to deliberate indifference to the rights of Plaintiffs.

97.     The pattern of similar constitutional violations against Plaintiffs and other protesters that occurred during the 2018 and 2020 protests demonstrates the deliberate indifference of the Defendants to the rights of Plaintiffs and other protesters.

98.     Further, given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Defendants demonstrated their deliberate indifference to the need for such training and supervision.

99.     Plaintiffs' First Amendment rights were violated when they were deliberately targeted and shot with KIPs, tear gas, flashbang grenades, and smoke during the course of her protest activities.

100.    Plaintiffs reasonably fear further retaliation in the future if they continue to observe, record, or participate in constitutionally protected activity.

101.    Defendants intentionally and with reckless disregard caused the injury of Plaintiffs by means of Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers' use of physical force to suppress free speech, which was instructed or authorized by Former Chief Hall. These actions or omissions were the direct result of the City of Dallas' written and unwritten policies.

102.    As a direct and proximate result of the acts and omissions of Defendants set forth above, Plaintiffs were deprived of their First Amendment rights to freedom of speech, freedom of

press, freedom of assembly, and freedom to petition the government for a redress of grievances. Plaintiffs' First Amendment rights were further chilled, and Plaintiffs suffered injuries and damages.

### Count 2: Civil Rights Claim (42 U.S.C. § 1983)
### Excessive Force
### Violation of Fourth and Fourteenth Amendment Rights
### Against Defendants the City of Dallas, Ryan Mabry, Victor Rocha, Melvin Williams, and
### John Doe Police Officers 1-50 in their individual capacities

103.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

104.    At all times alleged herein, Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers 1-50 were sworn police officers with the Dallas City Police Department and acting under color of law.

105.    At all relevant times alleged herein, no citizen, officer, or bystander was in imminent fear for their life or in fear of the Plaintiffs causing them serious bodily injury.

106.    At all relevant times alleged herein, Plaintiffs never threatened to harm any property.

107.    At all relevant times, Plaintiffs possessed the right to be free from excessive force.

108.    Defendant Hall instituted a policy and practice of using excessive force against non-threatening, peaceful protesters as a means of intimidation and control.

109.    Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers 1-50 used objectively unreasonable force when Plaintiffs did not pose an imminent threat of death or serious bodily injury to the Defendants or any other person during the relevant time alleged herein.

110.    Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers 1-50 further used objectively unreasonable force when Plaintiffs did not pose any threat of harm to property during the relevant time alleged herein.

111.    Several officers on the bridge did not use any force at all because it was unreasonable and unjustified. This further demonstrates that Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers' use of force was objectively unreasonable.

112.    It is clearly established law that using physical force such as KIPs—including rubber, sponge, or pepper bullets—against a non-threatening individual is unreasonable and violates the Fourth Amendment right to be secure in their person. And, given the gross disparity between the need for force and the level of pain and injury inflicted, the officers' use of force was malicious and sadistic.

113.    Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers 1-50 did not need to fire KIPs at a non-threatening peaceful crowd. Moreover, the use of KIPs bullets was unwarranted and excessive to the articulated need of dispersing protesters from the Margaret Hunt Hill Bridge and excessive to the purported need of effectuating arrest.

114.    Likewise, Defendants' use of force was inappropriate and unwarranted as a use of crowd control for peaceful, non-threating participants in protests, in violation of the Plaintiffs' Fourteenth Amendment rights to due process.

115.    The excessive force used by Defendants Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police officers 1-50 is the direct result of the City of Dallas' *de facto* unwritten policy allows police to use "less lethal"—but not "nonlethal"—ammunition and devices against a crowd, including against protesters who are not immediately threatening serious

physical injury. The City of Dallas knew since at least the 2018 protests following Botham Jean's death of the obvious risk that KIPs would cause the type of physical and constitutional injuries that Plaintiffs have suffered. And the City of Dallas has used sponge/rubber bullet KIPs since at least 2013. Yet the City has never developed any written or unwritten policy regarding the constitutional use of the KIPs and, thus, it was highly predictable that Dallas Police officers would continue to violate protesters', bystanders', journalists', and citizens' (like Plaintiffs) constitutional rights using sponge/rubber and other KIPs. Accordingly, the City of Dallas and Defendant Hall have been deliberately indifferent to the complete lack of training, or completely inadequate training, they have given Dallas Police officers on these "less lethal" forms of ammunition.

116.    The written and unwritten policies of the Defendant the City of Dallas, therefore, are the moving forces behind Plaintiffs' constitutional violations inflicted through the excessive force of Defendants Mabry, Rocha, Williams, and John Doe Police officers 1-50.

117.    As a direct and proximate cause of Defendants' use of excessive force, Plaintiffs suffered and continue to suffer severe injuries including, but not limited to, emotional distress and physical pain and suffering.

### Count 3: Civil Rights Claim (42 U.S.C. § 1983)
### Unlawful Seizure
### Violation of Fourth Amendment Rights
### Against the City of Dallas, Ryan Mabry, Victor Rocha, Melvin Williams, and John Doe Police Officers 1-50 in their individual capacities

118.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

119.    Plaintiffs were seized by Defendants Mabry, Rocha, Williams, and John Doe Police officers 1-50 when Dallas Police officers willfully, through the use of force and threat of arrest,

chemical agents, KIPs and other projectiles, "kettling," and other riot control tactics, terminated Plaintiffs' freedom of movement.

120.    Defendants committed these acts without forewarning or justification and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

121.    At all times relevant, Plaintiffs did not commit a crime.

122.    At all times relevant, Plaintiffs did not pose a threat to any of Defendants' officers or agents, to Plaintiffs themselves, or to any other person.

123.    It was the City of Dallas' custom and policy, as well as the City of Dallas' and Defendant Hall's failure to train, supervise, and discipline its officers or issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

124.    Plaintiffs' Fourth Amendment rights were violated when they were deliberately targeted and shot with KIPs, tear gas, flashbang grenades, and pepper spray during the course of Plaintiffs' lawful protests and presence at the protests. Because Dallas Police officers actively threatened Plaintiffs with these "less lethal" weapons throughout their encounters with Dallas Police, Plaintiffs were not free to leave without such physical force being used against them.

125.    Plaintiffs reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

126.    It is the pattern and practice of the City of Dallas and Former Chief Hall to arrest but not charge protesters as a means to suppress First Amendment rights. As explained above, it

is also the City of Dallas' *de facto* unwritten policy for police to use "less lethal"—but not "nonlethal"—ammunition and devices against a crowd, including against protesters who are not immediately threatening serious physical injury.

127.    These written and unwritten policies of the Defendant the City of Dallas, therefore, are the moving forces behind Plaintiffs' unconstitutional seizure in violation of their Fourth Amendment rights.

128.    As a direct and proximate result of Defendants' acts and omissions as stated above, Plaintiffs were deprived of their Fourth Amendment rights and suffered injuries and damages.

### Count 4: Civil Rights Claim (42 U.S.C. § 1983)
### Failure to Supervise & Discipline
### Violation of Fourth and Fourteenth Amendment Rights
### Against the City of Dallas and Former Chief Reneé Hall in her individual capacity

129.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

130.    The City of Dallas and Former Chief Hall are directly responsible for supervising police officers in the use of physical and lethal force and for disciplining police officers for using force that violates City policies or the Unites States Constitution.

131.    The City of Dallas and Former Chief Hall knew at least as early as 2018 that Dallas Police officers were using KIPs like Pepper Balls as a means of crowd control for non-threatening protestors in violation of the General Orders of the Dallas Police and the United States Constitution. But the City of Dallas and Former Chief Hall deliberately chose not to supervise Dallas Police officers to ensure they were only using KIPs within the constitutional limits on the use of force. The City of Dallas and Former Chief Hall also failed to discipline officers who used KIPs against non-threatening protesters or to discipline officers who used KIPs in a manner that

violated the General Orders and the Constitution. Instead, Former Chief Hall further authorized the unsafe use of KIPs and authorized the further use of the ammunition to peaceful, non-threatening, protestors, as a means of crowd control and to deter the exercise of Plaintiffs' First Amendment rights. This constituted deliberate indifference toward the outrageous and reckless use of force.

132.    The City of Dallas and Former Chief Hall also knew of the risks associated with the 40 mm eXact iMpact extended range sponge round, including certain incapacitation, or significant injury. But the City of Dallas and Former Chief Hall also failed to take disciplinary action in response to the unlawful use of KIPs against non-threatening crowds protesting the death of George Floyd in 2020. The City of Dallas and Former Chief Hall also failed to take disciplinary action in response to officers using KIPs for crowd control in an unlawful manner that was likely to cause serious injuries and, possibly, death.

133.    Although the City of Dallas has used sponge and/or rubber bullet KIPs since at least 2013 and the City issued General Orders for less lethal Pepper Ball KIPs by 2016 at the latest, the City and Former Chief Hall have never issued General Orders regarding sponge and/or rubber bullet KIPs. Likewise, Former Chief Hall and the City of Dallas ratified the use of Pepper Ball KIPs against non-threatening protestors in violation of those General Orders. Upon information and belief, to date, none of the Defendant officers or any other Dallas PD officers present or working during the 2020 Protests have been terminated, disciplined, required to have additional supervision, or required to undergo additional training. Accordingly, given that Former Chief Hall did not discipline or supervise police officers who used sponge and/or rubber bullet KIPs against

Plaintiffs and other non-threatening protesters, it is reasonable to infer that in the eyes of the City of Dallas and Former Chief Hall, the officers' illegal conduct actually conformed with City policy.

134.    These written and unwritten policies of the Defendant the City of Dallas in failing to supervise or discipline the Dallas Police officers are, therefore, the moving forces behind the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

135.    As a direct and proximate result of Defendants' acts and omissions as stated above, Plaintiffs were deprived of their Fourth and Fourteenth Amendment rights and suffered injuries and damages.

**COUNT 5: CIVIL RIGHTS CLAIM (42 U.S.C. § 1983)**
**FAILURE TO TRAIN**
**Violation of Fourth and Fourteenth Amendment Rights**
*Against the City of Dallas and Chief Reneé Hall in her individual capacity*

136.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

137.    The City of Dallas and Former Chief Hall are directly responsible for training on the use of firearms with regard to lethal and allegedly less lethal impact weapons, the manner of use, distance of use, and use of force continuum.

138.    Former Chief Hall had direct supervisory and policymaking responsibilities for police officers in the use of physical and lethal force.

139.    Defendant Hall knew of the risks associated with the 40 mm eXact iMpact extended range sponge round but failed to institute any training with regard to the range and risks of certain incapacitation, or significant injury.

140.    Defendant Hall and the City of Dallas knew that as of 2018, the Dallas Police Department officers were using KIPs like Pepper Balls as a means of crowd control for non-

threatening protestors in violation of the General Orders of the Dallas Police and the United States Constitution. But Former Chief Hall deliberately chose not to train the Dallas Police officers regarding the threat level necessary to justify using the Pepper Ball System or other KIPs against a crowd within the constitutional limits on the use of force. Instead, Defendant Hall further authorized its use and authorized the further use of such ammunition toward peaceful, non-threatening protestors as a means of crowd control and to deter the exercise of Plaintiffs' First Amendment rights. This constituted deliberate indifference and outrageous and reckless use of force.

141.    The City of Dallas and Former Chief Hall also knew of the risks associated with the 40 mm eXact iMpact extended range sponge round, including certain incapacitation, or significant injury. But the City of Dallas and Former Chief Hall also failed to train officers in the threat level necessary to justify using the sponge bullet KIPs against crowds within the constitutional limits on the use of force. The City of Dallas and Former Chief Hall also failed to train officers to use KIPs in manners unlikely to cause serious injuries and death.

142.    Even after the abuses of Pepper Ball KIPs in 2018, Former Chief Hall and the City of Dallas ratified the use of Pepper Ball KIPs against non-threatening protestors in violation of applicable General Orders and the Constitution. The City of Dallas and Former Chief Hall actually knew or should have known that that approach has failed to prevent tortious conduct by Dallas Police officers. The City of Dallas and Former Chief Hall's continued adherence to approving of using KIPs in violation of the General Orders and the Constitution demonstrates the conscious disregard the City of Dallas and Former Chief Hall have for the consequences of their actions.

143.     Large-scale protests against police brutality have taken place in Dallas with increasing regularity. And each time Dallas Police officers are on the scene at such protests, they come clad in riot gear and armed with riot control devices, and often travel in armored vehicles. Repeatedly since protests began in Dallas on May 29, 2020, Dallas Police officers have used KIPs, tear gas, flash-bang grenades, and other riot control devises against protestors who are not threatening, thereby violating the protesters' constitutional rights.

144.     The need for training officers in how to use KIPs lawfully in these recurring situations—particularly where no training has been provided—could hardly have been more obvious to the City of Dallas or Former Chief Hall since at least the unlawful use of KIPs against crowds in the 2018 protests following Botham Jean's death. Absent such training regarding situations like this that are likely to recur, it was highly predictable that Dallas Police officers would continue to violate protesters' constitutional rights. Accordingly, the City of Dallas and Former Chief Hall were deliberately indifferent to the complete lack of training, or completely inadequate training, they have given Dallas Police officers.

145.     These written and unwritten policies of the Defendant the City of Dallas in failing to train the Dallas Police officers, therefore, are the moving forces behind the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

146.     As a direct and proximate result of Defendants' acts and omissions as stated above, Plaintiffs were deprived of their Fourth and Fourteenth Amendment rights and suffered injuries and damages.

### COUNT 6: PERMANENT INJUNCTIVE RELIEF
*Against the City of Dallas, Ryan Mabry, Victor Rocha, Melvin Williams,
and John Doe Police Officers 1-50 in their individual capacities*

147.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

148.    Additionally, and in the alternative, Plaintiffs are entitled to permanent injunctive relief against Defendants.

149.    Plaintiffs have suffered irreparable injury as a result of Defendants' conduct, and the failure to grant permanent injunctive relief will result in further irreparable injury. The loss of constitutional rights constitutes irreparable harm, particularly where the First Amendment is concerned. Loss of First Amendment freedoms—even for minimal periods of time—constitutes irreparable injury. As demonstrated herein, the actions of DPD officers, authorized and directed by the City of Dallas and Former Chief Hall, have had the effect of blocking demonstrators, bystanders, and press from fully exercising their First Amendment rights. Additionally, Defendants' actions chill Plaintiffs' prospective exercise of their rights.

150.    Defendants' tactics also caused and continue to cause irreparable harm under the Fourth Amendment. It is well-established that using deadly force against a person who does not pose an immediate threat of serious harm violates the person's Fourth Amendment right to be free from excessive force. Firing weapons that—although allegedly "*less* lethal" than firearm rounds—are nonetheless *still* lethal constitutes excessive force when used against people who pose no immediate threat of serious harm at the time. Plaintiffs and other protesters, bystanders, and press will continue to face excessive deadly force unless the City of Dallas and Dallas PD officers are enjoined from using such weapons against people who pose no immediate threat of serious harm at the time.

151.     Plaintiffs are likely to succeed on the merits of their First and Fourth Amendment claims. The City's authorization of the use of less-lethal weapons to control and suppress has chilled and is chilling Plaintiffs' rights to assemble, petition for redress of grievances, freedom of speech, and freedom of the press, and constitutes retaliation in violation of the First Amendment. The United States Supreme Court has upheld preliminary injunctions based on the First Amendment where police action chills people from exercising their First Amendment rights. The City's policies and practices have been overbroad and underinclusive: rather than focus on arresting, the DPD has hurled canisters of tear gas and smoke at entire crowds of peaceful protesters and indiscriminately fired KIP guns at individual protesters not involved in any conduct that posed an immediate threat of serious harm at the time. The use of such excessive deadly force is not "narrowly tailored" and necessary for keeping roadways clear or for preventing property destruction—neither of which are compelling. Thus, the DPD's policies and practices do not survive strict scrutiny. Further, since the DPD's force is directed squarely at suppressing free expression—and restricts First Amendment freedoms far more than necessary to prevent an immediate threat of serious harm at the time—the policies and practices also fail intermediate scrutiny. The City's actions also violate the Fourth Amendment prohibition on excessive force, and the First Amendment rights at stake strengthen that claim. The City's authorization of the use of allegedly "less lethal" weapons against protestors, bystanders, and press as a means of "crowd control," absent *any* imminent threat of serious harm to anyone, is inherently excessive, and violates the Fourth Amendment

152.     Remedies available at law are inadequate to fully compensate for Plaintiffs' injuries because the loss of their First and Fourth Amendment constitutional rights constitutes an

irreparable harm. Furthermore, permanent injunctive relief is necessary to ensure that future harm is not inflicted on Plaintiffs and others seeking to exercise their constitutional rights in Dallas. Without permanent injunctive relief to prevent Defendants from using these tactics on crowds or people not posing an immediate threat of serious harm at the time in the future, Plaintiffs and others similarly situated will be chilled from exercising their constitutional rights and could potentially incur additional physical injuries caused by Defendants.

153. Considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted here. Plaintiffs' injuries and the likelihood of future injuries to Plaintiffs and other peaceful protesters similarly situated outweigh any damage that the injunction will cause Defendants. Dallas PD's and Officers Mabry, Rocha, Williams, and John Doe Officers 1-50's use of allegedly "less lethal" devices to control crowds during protests harms not just the Plaintiffs in this lawsuit but many similarly situated people seeking to exercise their First Amendment rights, including members of the press. Rather than develop a narrowly tailored policy to deal with the scarce few disruptive protesters, the City has chosen an overbroad one: punish all protesters (as well as the press who cover their demonstrations and bystanders who may be nearby) with chemical weapons such as tear gas, smoke bombs, flash-bangs, Pepper Balls, mace, and KIPs such as rubber, sponge, and foam bullets—among other riot-control weapons and techniques—rather than specifically deal with any individual persons who pose an immediate threat of serious harm at the time. Whatever interest the City might have in preventing property destruction or keeping roadways safe does not and cannot justify continuing to deploy lethal weapons against peaceful protesters. Moreover, an injunction is in the public interest because public health officials have made clear that the use of chemical agents—such as tear gas, smoke bombs, Pepper Balls, and

mace—poses a significant risk of spreading and exacerbating the ongoing COVID-19 pandemic. Finally, Defendants the City of Dallas and then-Chief Hall both agreed to the entry of this Court's June 11, 2020 Agreed Preliminary Injunction, indicating that the balance of hardships here does, in fact, weigh in favor of Plaintiffs' request for permanent injunctive relief.

154.   Finally, permanent injunctive relief would best serve the public interest.  It is always in the public interest to prevent the violation of a party's constitutional rights. Indeed, if Defendants agree that safety is in the public interest, then it is reasonable to conclude that it is in the public interest to keep protesters, bystanders, and press safe from DPD officers using lethal force against them under the guise of keeping roads and property safe. Accordingly, granting this temporary restraining order is undeniably in the public's interest. Because the City has pursued and continues to pursue a policy of excessive force against peaceful protesters in violation of their First and Fourth Amendment rights, Plaintiffs request that the Court issue an order permanently enjoining the indiscriminate use of this "less lethal" force on people who pose no immediate threat of serious harm at the time.

155.   Accordingly, Plaintiffs seek permanent injunctive relief to prohibit Defendants City of Dallas, Defendants Mabry, Rocha, Williams, and John Doe Officers 1-50, and all officers of the Dallas Police Department from:

- using "less lethal" weapons, such as tear gas, smoke bombs, flashbangs, pepper balls, mace, and other chemical agents in connection with protests: (a) against any protesters, bystanders, civilians, or members of the press, who are not posing any immediate threat of serious harm to anyone, or (b) using such devices or chemical agents for purposes of controlling peaceful crowds; and

- firing or deploying kinetic impact projectiles into a crowd for any purpose.

## VIII.   DAMAGES

156.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

157.     In whole or in part, as a result of some or all of the above actions or omissions of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of these violations. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs have suffered and will continue to suffer severe pain of mind and body, emotional dress, physical manifestations of emotional distress, humiliation, loss of enjoyment of life, disfigurement, physical impairment, and loss of earnings and earning capacity. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs were prevented and will continue to be prevented from participating as activists and peaceful protesters with regard to causes that directly impact their lives and the lives of their friends, families, and communities. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs have required and will in the future require medical treatment, therapy, counseling, and/or hospitalization to address the physical and mental injuries caused by Defendants' acts and omissions.

158.     As a direct and proximate result of Defendants' actions and omissions, as stated above, Plaintiffs suffered:

(a) Physical pain and suffering in the past and future;

(b) Mental anguish in the past and future;

(c) Medical expenses in the past and future;

(d) Disfigurement in the past and future;

(e) Physical impairment in the past and future;

(f) Lost earnings in the past and future;

(g) Loss of earning capacity in the past and future;

**(h)** Loss of Enjoyment of life in the past and future.

## IX.    STATUTORY DAMAGES

159.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

160.    Plaintiffs are entitled to compensatory damages and punitive damages pursuant to 42 USC § 1988.

161.    As a direct and proximate result of Defendants' acts and omissions in the foregoing respects, Plaintiffs have been required to retain the services of legal counsel and to incur attorney's fees and costs thereby.

162.    Plaintiffs bring this lawsuit pursuant to 42 U.S.C. § 1983. Plaintiffs are entitled to an award of reasonable attorney's fees. *See* 42 U.S.C. 1988.

## X.    PUNITIVE/EXEMPLARY DAMAGES

163.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

164.    Additionally, and in the alternative, the conduct of Defendants Mabry, Rocha, Williams, and John Doe Police officers 1-50 was done with malice and/or a specific intent by Defendants to cause substantial injury or harm to Plaintiffs.  As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.

165.    In the alternative, Defendants Mabry, Rocha, Williams, and John Doe Police officers 1-50's heedless and reckless disregard of Plaintiffs' rights, safety, and welfare constitutes more than momentary thoughtlessness, inadvertence, or misjudgment. Instead, Defendants Mabry, Rocha, Williams, and John Doe Police officers 1-50 acted with reckless or callous

indifference to the federally protected rights, safety, or welfare of others. Defendants had actual, subjective awareness of the risks of injury or illegality involved, but nevertheless proceeded with conscious, reckless, or callous indifference to the rights, safety, or welfare of others, including Plaintiffs. Such unconscionable conduct goes beyond ordinary negligence, and as such Plaintiffs request punitive and exemplary damages are awarded against Defendants Mabry, Rocha, Williams, and John Doe Police officers 1-50 in a sum which is within the jurisdictional limits of this court.

## XI.   JURY TRIAL DEMANDED

166.   Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues so triable.

## XII.   PRAYER

167.   WHEREFORE, Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiffs all applicable damages, including but not limited to compensatory, special, exemplary and/or punitive damages, in whatever amount Plaintiffs are entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

(a) Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to past and future: pain and suffering, medical expenses, loss of earnings and earning capacity, mental anguish, anxiety, humiliation, and embarrassment, disfigurement, physical impairment,

violation of Plaintiffs' Federal and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

(b) Statutory compensatory damages and punitive damages pursuant to 42 USC § 1988;

(c) Statutory attorneys' fees and costs pursuant to 42 USC § 1988;

(d) Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

(e) Reasonable attorney fees, pre-judgment and post-judgment interest, and costs; and

(f) Other declaratory, equitable, and/or permanent injunctive relief, as appears to be reasonable and just.

Date: July 1, 2021

*[The remainder of this page intentionally left blank.]*

Respectfully Submitted,

By:*/s/ Daryl K. Washington*
**Michelle Simpson Tuegel**
TX Bar No. 24075187
*Admitted*
**THE SIMPSON TUEGEL LAW FIRM**
3301 Elm St.
Dallas, Texas 75226
214-774-9121 (P)
214-614-9218 (F)
michelle@stfirm.com

**Daryl K. Washington**
TX Bar No. 24013714
*Admitted*
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883 (P)
214-751-6685 (F)
dwashington@dwashlawfirm.com

**Daniel A. Dailey, Esq.**
IL Bar No. 6312616
*Admitted*
ddailey@kingdomlitigators.com
**Tatiuana J. Holland, Esq.**
TX Bar No. 24090519
*Pro Hac Vice Admission Pending*
tjh@tjhollandlaw.com
**Adam Greenfield**
TX Bar No. 24075494
*Admitted*
**KINGDOM LITIGATORS, INC.,**
*A Public Interest Law Firm*
3131 McKinney Ave., Ste. 600
Dallas, Texas 75204
(214) 422-9350 (P)
(469)736-0022 (F)

[*additional signatures continue on the following page*]

**Morgan A. McPheeters**
TX Bar No. 24081279
*Admitted*
**MCPHEETERS LAW, PLLC**
4447 N. Central Expy., Suite 101 #158
Dallas, Texas 75205
469-862-8233 (P)
morgan@mcpheeterslaw.com

**Jessica Foster**
TX Bar No. 24094123
*Admitted*
1408 N. Riverfront Blvd., Suite 241
Dallas, Texas 75207
(214) 865-9742 (P)
jfoster@jfosterlegal.com

**George Oginni**
TX Bar No. 24108191
*Pro Hac Vice Admission Pending*
LEO & OGINNI TRIAL LAWYERS, PLLC
3801 Kirby, Suite 605
Houston, Texas 77098
(713) 280-3204 (P)
george@helpishere.law

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2021, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

*/s/ Daryl K. Washington*
**Daryl K. Washington**